# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**VERA ARNOLD ADC # 706169**                    **PLAINTIFF**

MAR 0 9 2007

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

CASE NO. 1:07CV00009

VS.

**DR. CRAIG R. BARDELL, M.D.,**
**DR. J. ROLAND ANDERSON, M.D.,**
**RNP RACHEL JOHNSON**
**TOM BRADSHAW, Medical Administrator (CMS),**
**DR. SCOTT, M.D.,**
**DR. GABRIEL PEAL, M.D.,**
**CORRECTIONAL MEDICAL SERVICES (CMS),**
**LARRY NORRIS, Director of ADC,**
**LARRY MAY, Asst. Deputy Director,**
**DR. MAX MOBLEY, M.D., Medical Deputy Director,**
**JOHN BYUS, Medical,**
**JAMES GIBSON, Internal Affairs,**
**SR. WARDEN JOHN MAPLE, JR.,**
**MAJOR LINDA DIXON,**
**LINDA DYKES, DHO,**
**SGT. RANDY BUDNIK, GRIMES UNIT,**
**PHILLIP CARGILL, DHO,**
**GEORGIA WEAVER, AND**
**CPL. PATRICIA ROBERTS**

This case assigned to District Judge _____
and to Magistrate Judge _____

**DEFENDANTS**

---

# COMPLAINT
## 42 U.S.C. § 1983

---

*Requesting appointment of*
*Attorney John Hardy of the*
*Law Office of Peter Miller*

## STATEMENT OF CASE

1.     During January of 2001, Plaintiff filed a 42 U.S.C. § 1983 lawsuit against several of the current Defendants and other related to a sexual assault upon Plaintiff by then-Defendant Marcus King (Cadet Correctional Office of 2001 complaint).  During January of 2001, Plaintiff filed a motion for Temporary Restraining Order – Preliminary Injunction.  A teleconference was held between a federal judge and attorneys for parties, and the Court set a hearing date.  Prior to the scheduled hearing, the parties arbitrated an agreement to have Plaintiff evaluated and to adhere to those restrictions.  Those defendants include but are not limited to ADC, Larry Norris, and Warden John Maple.

Subsequently, Plaintiff was evaluated by Dr. Tan who issued a "permanent restriction(s)" on standard Medical Classification report MSF-103.  These include "non-wool environment"; "closed pod"; "Restrict assignment from environmental dust, pollen, chemicals, and airborne particles", and possibly others.

By ADC policy, a Form MSF-103 is a permanent restriction to be added to but not discontinued.  The re-evaluating physician must personally examine the patiently/inmate and may not make the decision based on memory, hearsay, conjecture, or ESP.  The purpose for this is to comply with the Medical Board's regulations and to provide adequate medical care based on a reasonable, professional judgment.

2.     During the pending January-2001 complaint (#1) and preliminary Injunction proceedings, one or more Defendants severely violated Plaintiff's medical restrictions in retaliation for the filing of Complaint #1 and did cause injury to Plaintiff.  Subsequently, Plaintiff was housed in medical for several days with an allergic reaction to being placed in a barracks

with wool. The <u>Agreement by Parties</u> was approved and filed after this incident, and the hearing was cancelled.

During approximately March of 2001, Plaintiff filed Complaint #2 against then –

Defendants for their acts of retaliation related to Plaintiff filing Complaint #1 for their causing injuries to Plaintiff by violating her medical restrictions and other acts of retaliation.

Many of the current Defendants have personal knowledge of Plaintiff's medical restrictions and severe allergy to wool. However, these Defendants have either attempted to undermine these medical restrictions to cause or attempt to cause injury on Plaintiff and to write or cause to be written a retaliatory disciplinary or they have turned a blind-eye to these Defendants' actions. More detail will be given later on this issue.

3.      On or about December 16 or 17, 2002, Plaintiff was made unassigned from her job in commissary and was in the barracks minding her own business. Plaintiff had recently returned from a Court Trip. Major Dixon was angry at Plaintiff because Plaintiff had been found "Not Guilty" of a disciplinary several days before. Warden Jim Cooksey had been transferred and a new assistant Warden had been assigned to the McPherson Unit. An Assistant Warden [Burrows] had sat in on Classification and made Plaintiff "unassigned" during this relevant period.

Major Dixon vindictively went to medical and had Dr. Sone call Plaintiff to re-evaluate her medical restrictions. Dr. Sone discontinued Plaintiff's medical restriction for "closed pad," but maintained her restriction for "non-wool environment." Plaintiff attempted to explain to Dr. Sone the reason Dr. Tan had written for "closed pod' and Major Dixon's intent to cause Plaintiff injury by failing to comply with the "non-wool environment" allergy restriction if Dr. Sone discontinued the "closed pod' restriction. Dr. Sone said that it is security's duty to comply with

Plaintiff's medical restrictions and that she could not dictate Plaintiff's housing assignment. Dr. Sone ignored the fact that Dr. Tan had evaluated the restrictions and then-Defendants were bound by his evaluation. Dr. Sone discontinued Plaintiff's "closed Pod" restriction at Major Dixon's request and assurance that Plaintiff's remaining restrictions would be complied with.

Immediately after Plaintiff arrived back at her barracks #11: cell 114B, Housing 2 Sgt Thomas ordered Plaintiff to pack her belongings and to move to barracks #14. When questioned, Sgt. Thomas stated that the conversation over heard by Plaintiff was Major Linda Dixon giving the said order.

Plaintiff moved into Barracks #14 which was full of wool blankets and violated Plaintiff's "non-wool environment" medical restriction. Plaintiff filed an emergency grievance Mcp-02-4570 on the situation. Plaintiff had a severe allergic reaction and medical refused to see Plaintiff. This reaction progressed until Plaintiff's body was covered with whelps a rash and her face now has scarring as a direct result. Plaintiff filed a number of grievances over a three (3) week period until all of the wool-blankets were finally removed by Captain Donald Black. See also grievance McP-02-4571.

Eventually in January of 2003, Plaintiff was assigned to the law library and moved to a "closed pod", non-wool environment in Barracks #4, Cell #114B, with a roommate [Eunice Leaks] with a non-wool blanket.

4.      On January 15, 2004, Plaintiff met Dr. Craig Robert Bardell, M.D., for the first time. Dr. Bardell did not properly evaluate plaintiff for her medical restriction renewal because he refused to pull her second volume of records from storage and he refused to properly examine her regarding her complaints that would effect her medical restrictions. Plaintiff has a bladder problem and vaginal cystocele that was developed in prison. Dr. Bardell refused to examine

Plaintiff for this and refused to refer back out to a urologist [Dr. Emery] whom Plaintiff was seeing. Dr. Bardell told Plaintiff to wear a tampon to hold it in place and that it was God's way of punishing her for her sins. Plaintiff told Dr. Bardell to leave his religion at home. Dr. Bardell refused to evaluate Plaintiff for a large lump in her right axilla which she said was an enlarging lymph node. Dr. Bardell further refused to find out why Plaintiff had not been out for a surgery consult previously ordered to evaluate this lump.

Dr. Bardell falsely documented "no incontinence with coughing or sneezing". This is contrary to Plaintiff's complaint of stress incontinence, her need to constantly wear feminine pads, and her prescription for Ditropan 10 mg. P.O. BID.

Subsequently, Plaintiff field grievance # McP-04-0289-600 and a complaint against Dr. Bardell with the Arkansas Medical Board.

Plaintiff also filed grievance #McP-04-398-600 and McP-04-0402-600.

Grievance McP-04-0402-600 was found to have merit (lump in right axilla). However, nothing has been done to date, over a year later.

Plaintiff continued to try to be examined to have her medical restrictions renewed and to be seen about her bladder and the lump in her right axilla. See grievance #McP-04-0536.

5.      On January 16, 2004, Plaintiff saw RNP Rachelle Johnson and had her first pelvic and Pap smear in several years. At this time, RNP Johnson noted that a cystocele was present.

6.      During February of 2004, Plaintiff talked to Dr. Max Mobley in the law library for almost an hour regarding the lack of medical care being received. Plaintiff took off her shirt and showed Dr. Mobley the lump in Plaintiff's right axilla. Dr. Mobley took note and said that it needed to be addressed immediately.

The next day, Plaintiff was called to the front "Admin". To talk to John Byus about the problems and lack of medical being received. Again, Plaintiff took off her shirt and showed Mr. Byus the lump. He said that he would check into it.

Plaintiff complained to Both Dr. Mobley and Mr. Byus about Dr. Bardell writing for her asthma inhalers incorrectly: Albuterol (2) puffs QID and Ventolin (2) puffs BID, instead of albuterol and Qvar40 (Beclomethason). Albuterol and Ventolin are the same medication, a quick acting bronchodialator. Qvar40 is a long acting steroid "maintenance" inhaler. Plaintiff told Mr. Byus that she would hold her breath and move her chest muscles the next time Dr. Bardell listens to her chest.

The following day (Friday), Plaintiff saw Dr. Bardell for Chronic care [Asthma]. As Plaintiff told Mr. Byus, she held her breath and moved her chest muscles to appear that she was breathing when Dr. Bardell listened to her lungs. He told her that her lungs were "clear." Plaintiff tried to nicely tell Dr. Bardell that he had misordered her asthma inhalers. He told her they were correct. Plaintiff told Dr. Bardell that albuterol and ventolin were the same inhaler. Dr. Bardell got defensive telling Plaintiff that Ventolin was a long-acting steroid inhaler. Plaintiff told him that she had looked it up in the PDR to be sure and they were the same. A few more words were exchanged as Dr. Bardell got up in Plaintiff's facing gritting his teeth and clenching his fist in an almost psychotic manner and left.

That afternoon, Plaintiff saw Mr. Byus in the law library and told him what had happened.

At some point in February, Plaintiff was evaluated by RPN Rachelle Johnson for the mass in her right axilla.

Medical Administrator Perry Tidwell talked to Plaintiff regarding these issues. He will testify to the difficulty dealing with Dr. Bardell and the lack of adequate medical care being received at the McPherson Unit by Dr. Bardell.

7.     On March 16, 2004, Plaintiff was evaluated by Dr. J. Roland Anderson (CMS Administrator for the Region). Dr. Anderson misdiagnosed the lump as a "lipoma" but referred Plaintiff to Diagnostic Unit for an in-house Surgery consult with Dr. Scott to see if Plaintiff needed to be referred out later. Dr. Anderson becomes one of the individuals that undermines Plaintiff's medical care to conceal his misdiagnosis and to save CMS money at the expense of Plaintiff's health and life. Plaintiff even wrote Dr. Anderson one or more letters.

8.     On March 23, 2004, the U.S. Department of Justice (DOJ) was evaluating the McPherson Unit. Plaintiff filed an emergency grievance McP-04-00779-600 by handing it to Captain Donald Black in front of Warden Maple and an agent of DOJ.

Later, Charles Jakosa (attorney for DOJ) came into the law library and talked to Plaintiff. He wrote Plaintiff's name and complaint of the lump in her right axilla down to give to the DOJ Physician, Dr. Fowlkes.

Later yet, another DOJ representative [short dark haired male] talked to Plaintiff. Petitioner showed him the lump in right axilla. He wrote down her information to give to the DOJ physician who was examining records in medical.

9.     On April 15, 2004, Plaintiff saw Dr. Scott at DGU for an in-house surgical consultation. Dr. Scott ordered a biopsy, surgical consultation, ultra sound, and lumpectomy.

10.    Dr. Bardell referred Plaintiff to Dr. Gabriel Peal who works at Southwest Hospital rather than UAMS where female inmates are normally referred.

11.     On May 5, 2004, Plaintiff saw Surgeon Dr. Gabriel Peal regarding her <u>right</u> axilla lump. Dr. Peal pinched it very hard calling it a "lipoma". This caused Plaintiff to have severe pain and the lump would increase in size over the next few months. This act of assault and battery likely resulted in metastasis over the next several months. Upon Plaintiff's insistence, Dr. Peal sent her downstairs for an ultra sound (US) of the <u>right</u> axilla per Dr. Scott's recommendation/order. Dr. Peal said that a biopsy cannot be done on the lump because it was a "lipoma". And he did not order one at that time. Plaintiff was taken to Southwest Hospital radiology department for an ultrasound.

Dr. Terrence A. Oddson, M.D., performed the ultrasound. Dr. Oddson determined the <u>right</u> axilla lump to be "suspicious". And personally called Dr. Peal with his concerns. Dr. Oddson recommended a MRI.

Dr. Peal recommended an ultrasound and a lumpectomy of the <u>right</u> axillary mass. The Ultrasound was completed as noted above and a MRI was done. See grievance #McP-04-0779-600.

12.     On May 24, 2004, Plaintiff was transported to Newport Hospital for a MRI of the <u>right</u> axilla. Dr. Mufiz Chauhan eventually read the MRI. He did <u>not</u> diagnose Plaintiff with a "lipoma" while he did not rule it out. Dr. Chauhan was not asked to address the lymphatics and failed to do so despite an obviously enlarged lymph node.

Plaintiff obtained a second opinion (verbal) regarding her MRI to determine whether she needed to aggressively pursue obtaining medical care or to "let it go". Plaintiff received the message that the MRI reflected a enlarged lymph node(s) and that she needed a biopsy ASAP.

Plaintiff told Tom Bradshaw, Dr. Anderson, Dr. Bardell, Warden Maple, Major Dixon, RNP Rachelle Johnson, Max Mobley, John Byus, ADC, CMS, and others of this finding and begged for help to no avail. See grievance #McP-04-1388-900.

13.     During the month of June of 2004, Plaintiff was in Major Linda Dixon's Office for an unrelated matter. Major Dixon took advantage of Plaintiff's presence and questioned her regarding her relationship to Captain Donald Black (male). Major Dixon made it very clear to Plaintiff that Dixon wanted to terminate Captain Black's employment with ADC and wanted Plaintiff's help to do so. Major Dixon threatened Plaintiff if she refused to cooperate with Dixon by providing incriminating information and statements against Captain Black. Plaintiff made it very clear to Major Dixon that she would not provide any information and/or statements against Captain Black or that a relationship existed.

Prior to leaving, Major Dixon threatened Plaintiff by stating: "You will regret this. I Promise." Plaintiff reported this conversation to Captain Black.

14.     On or about April 12, 2004, Plaintiff ordered five (5) bed dolls from C & J Country Crafts when the craft order came in. Plaintiff's invoice contained this note:

> "Bed dolls back ordered at this time. Watch your mail for a note regarding this item."

Over the next 1½ months, Plaintiff received several letters from Joyce (owner) of C&J Country Crafts regarding what dolls she had in stock trying to solicit them to Plaintiff.

It should be noted that Cpl. Roberts (Craft Supervisor) failed to sign out-going and incoming craft order forms frequently.

15.     On Plaintiff's April 28, 2004 crafter order form, Joyce (C&J) wrote the following note:

Vera,

Let me know if you need any of those dolls that I listed for you so I can put them aside for you. I also have several pillow doll bodies.

Thanks

Joyce

16.     Subsequently, Plaintiff attempted to order ten (10) chunky children's dolls of the list that Joyce had mailed her. Plaintiff also wrote Joyce and asked her to hold those dolls in "stock" for her as Joyce had instructed her to. Plaintiff placed her craft order form in an envelope and placed an inmate request with it, which was addressed to Cpl. P. Roberts. Plaintiff dropped it in the inmate mailbox per protocol. This was to be placed in Cpl. Robert's mailbox by mailroom staffing for processing.

17.     During early June, Cpl. Roberts came to the law library to discuss Inmates' Lucille Smith's and Plaintiff's orders for "chunky children's dolls" as related to their desire to dress them and donate them to the Arkansas Children's Hospital or the Women's shelter. Inmate Smith explained the doll project to Cpl. Robert's satisfaction. Smith and Plaintiff questioned Cpl. Roberts on the status of their orders and she told them that the orders were being processed. A letter was written to C & J./Joyce, signed by Smith and Plaintiff, and given to Cpl. Roberts to mail.

18.     On June 16, 2004, Plaintiff was seen at UAMS by Dr. Kumar. Dr. Kumar diagnosed Plaintiff with a vaginal cystocele, stress incontinence, urinary retention, and incomplete emptying of the bladder with an intermittent curve on the uroflow study. Dr. Kumar recommended discontinuing Ditropan in preparation for an urodynamic study.

19.     On June 17, 2004, Sr. Warden John Maple made Petitioner unassigned from the law library pending investigation.

20.     On June 18, 2004, Major Dixon ordered Captain N. Faust to place Plaintiff in segregation "under investigation". Captain Faust informed Petitioner of this.

21.     On June 22, 2004, Plaintiff was taken to Major Dixon's office by Captain Faust. Major Dixon did not want to hear anything Plaintiff had to say.

At 4:15 p.m., Captain N. Faust wrote Plaintiff's first Major Disciplinary. Captain N. Faust wrote Plaintiff's retaliatory disciplinary at the express direction and insistence of her supervisor, Major Dixon see 959 F. 2d 110.

On June 29, 2004, Defendant Disciplinary Hearing Officer Linda Dykes violated Plaintiff's statute of limitations and procedural due process rights by hearing the expired disciplinary from an incident that occurred and was discovered on or before June 17, 2004, without an extension, in violation of *Richmond v Duke, 909 F Supp. 626 (1995)*. Defendant Dykes found Plaintiff guilty which resulted in: Plaintiff being reduced to a Class IV, punitive segregation for 30 days, other sanctions and loss of her guaranteed parole date.

Defendants Maple, Gibson, Norris, and ADC affirmed on appeal despite the *Richmond* and other procedural and due process violations.

Plaintiff's procedural due process claims do not require the disciplinary decision to be invalidated as her procedural due process rights were clearly established in *Richmond* and intentionally violated by Defendants Dykes, Maple, Gibson, Norris and ADC.

Plaintiff expressly states that she seeds relief in the form of monetary damages only, and not restoration of good time class etc. which can be challenged by others means.

Plaintiff's *Richmond* claims do not "call into questions the lawfulness of Plaintiff's continuing confinement", and claims that Defendant(s) used the wrong procedures, rather that for reaching the wrong result. *Armento-Bey v Harper,* 68 f 3d 215 (8th cir-1995).

22. On July 14, 2004, Plaintiff wrote grievance #McP-04-1178 regarding misconduct by staff. Plaintiff had already personally talked to Warden John Maple.

23. On July 23, 2004, Plaintiff wrote grievance #McP-04-01219-803 against Major Dixon and Cpl. P. Roberts for hiding and/or destroying the letter described in paragraph #18 which would have proven that Cpl. Roberts approved Plaintiff's craft order but that she forgot to sign the order form. It would have proven that Plaintiff was not guilty of the disciplinary dated June 22, 2004, and would help prove that it was a retaliatory disciplinary written at the express direction and insistence of Major Dixon. See 959 F. 2d 110.

The loss or destruction of this letter by Major Dixon which would have proven that Cpl. P. Roberts lied during the investigation and that Plaintiff was actually innocent denied Plaintiff her most basic due process rights regardless of the out come of the disciplinary hearing.

It will also help establish a pattern of retaliatory behavior by Major Dixon, which is silently approved by, or a blind-eyed turned to by other Defendants in this cause. Plaintiff will be more specific later regarding involvement by Defendants.

24. On July 29, 2004, an incident occurred in Segregation in which Cpl. Monty Montgomery [who was already being investigated by internal affairs for allegations of sexual misconduct] sexually harassed Plaintiff in front of another inmate.

Plaintiff filed a grievance on this matter [pending], and she was questioned by Internal Affairs on Monday, August 2, 2004. Petitioner provided a copy of her notes on the incident. This infuriated Major Dixon.

25.     On Thursday, July 29, 2004, Plaintiff was scheduled to be released from Segregation. Major Dixon again retaliated against Plaintiff by trying to have Plaintiff's medical restrictions discontinued to cause injury, scarring, pain, suffering, and/or death upon Plaintiff. This retaliation was meant to cause assault and battery upon Plaintiff.

Major Dixon went to Dr. Craig Robert Bardell, M.D., and RNP Rachelle Johnson to try to accomplish her goal of discontinuing Plaintiff's medical restrictions for "Closed Pod" and "non-wool environment". At Major Dixon's behest and Dr. Bardell's order, RNP Rachelle Johnson wrote Plaintiff a new temporary medical restriction form MSF 207 for a "non-wool blanket", without examining Plaintiff whom was in segregation. In their haste, they failed to realize that this did not void Plaintiff's valid medical restriction, which were written on a separate MSF 207 and MSF 104. A copy of the new MSF 207 was given to Plaintiff.

26.     On Thursday, July 29, 2004, at approximately 6:50 p.m., Corporal Rice came to Plaintiff's segregation cell and told Plaintiff that she was to move to Barracks #14 which was full of wool blankets. Plaintiff told Cpl. Rice that barracks #14 was an "open barracks" full of wool blankets, which violates Plaintiff's permanent medical restrictions as listed on her Medical Classification Report [Form MSF-103], and her Medical Restriction form [Form MSF-207].

Petitioner showed her then-current Medical Restriction [Form MSF-207] to Cpl. Rice.

Cpl. Rice responded that Sgt. Wagner stated that Plaintiff could be placed in an "open barracks" as long as there are no wool blankets over the top of Plaintiff. Cpl. Rice further stated that a few bed moves had been made moving non-wool blankets around the bed Plaintiff was to occupy, but that there were still a lot of wool blankets in the barracks.

Cpl. Rice told Plaintiff that Major Dixon had talked to medical that day and that someone had stated that it was okay to put Plaintiff in an open barracks with wool blankets. Plaintiff argued otherwise.

Cpl. Rice told Plaintiff had to move to her designated bed in Barracks #14 or that Cpl Rice had been instructed to write Plaintiff a Major Disciplinary Report (henceforth called "MDR"), even though Cpl. Rice did not agree with the order.

Cpl. Rice called Sgt. Wagner and Sgt. Cullum about Plaintiff's medical slip. Cpl Rice then returned and told Plaintiff that Cpl. Rice had been instructed by Sgt. Cullum to write Plaintiff a MDR.

27.    On July 29, 2004, at approximately 6:58 p.m., Plaintiff wrote an emergency grievance on the incident described in paragraph #27. See grievance #McP-04-01250-900. Plaintiff appealed this grievance.

28.    Later, Sgt. Cullum came to segregation. Plaintiff asked to speak to Sgt. Cullum. He went to Plaintiff's cell. Plaintiff showed him Arnold's medical restriction slip [Form MSF-207] that states "closed pod' and "non-wool environment" and told him of her MSF 103.

Sgt. Cullum told Plaintiff to take it to the MDR Court. He stated that Plaintiff was right but that he was following his orders from Major Dixon. Major Dixon ordered him to have the segregation officer write a disciplinary to anyone who refuses to move. No exceptions! She had spoken to him that day and given him that order.

Sgt. Cullum further stated that he had talked to Major Dixon earlier about a girl in medical who was having a baby, and that Major Dixon specifically asked him if Plaintiff had moved.

**NOTE:** Sgt. Cullum is the live-in boyfriend of Linda Dykes. Linda Dykes is the Disciplinary Hearing Officer (DHO) who heard Plaintiff's MDR dated June 22, 2004, and found Arnold guilty despite numerous procedural and due process violations, including the disciplinary being expired. She also listened to Plaintiff's phone calls during the investigation process of the same disciplinary that she presided over, in violation of Plaintiff's due process right to an unbiased hearing officer. Linda Dykes made the bed movement sheet that required Plaintiff to move into Barracks #14 with wool blankets.

29. On Friday, July 30, 2004, Plaintiff talked to the segregation sergeant, Sgt. Steed, regarding the situation. Sgt Steed told Plaintiff that Major Dixon had and arranged for fifteen (15) women with non-wool blankets to surround Plaintiff's assigned bed (Bks.#14-Bed #7), and that Arnold was to be put "smack dab in the middle of them." She admitted that there were a large number wool blankets still in Barracks #14.

Sgt. Steed asked Plaintiff if Arnold was taken to medical "yesterday" (7/29/04). Plaintiff told Sgt. Steed, "No". Sgt. Steed stated that Plaintiff was to have been taken there for a re-evaluation of her medical restrictions per Major Dixon. Sgt Steed documented this in the segregation log and will testify to it.

30. On Friday July 30, 2004, at approximately 1:20 p.m., Sgt. Wilson served Plaintiff a MDR for refusing to move into Barracks #14 (which violated Plaintiff's medical restrictions and endangered her safety). This will henceforth be referred to as MDR #2.

MDR #2 was dated and timed on July 29, 2004, at approximately 8:20 p.m. This not the correct time as evidenced by Plaintiff's emergency grievance McP-04-1250 (which reflects 6:58 p.m.), which will also be verified by the camera films.

Cpl. Rice wrote Plaintiff's retaliatory disciplinary [MDR#2] at the express direction and insistence of Major Linda Dixon through Sgt. Cullum. *See 959 F. 2d 110.*

Major Dixon signed and approved MDR #2 as evidenced by her initials appearing on said document in the appropriate "C.S.O. Review" section.

31.     Later that day, Plaintiff talked to Lt. Loftis regarding the situation. Plaintiff gave her original stamped copy of her MSF-207 to Lt. Loftis with explicit instructions that Arnold wanted her original MSF-207 back.

Lt. Loftis took Plaintiff's valid medical slip to Major Dixon. In a panic, Major Dixon took it to medical to Dr. Bardell and RNP Rachelle Johnson. They kept Plaintiff's original medical slip without Plaintiff's permission. Dr. Bardell instructed RNP Johnson to void it immediately. This constituted spoliation and Petitioner is entitled to an adverse inference. This was a destruction of Plaintiff's legal document and was done with the intent to interfere with and/or actively or constructively deny Plaintiff access to the Courts.

RNP Johnson discontinued Plaintiff's Form MSF-207 without physically reevaluating Plaintiff. RNP Johnson further discontinued Plaintiff's asthma restrictions without seeing her. However, Petitioner is still diagnosed with asthma and uses inhalers. See grievance #McP-04-0779-600. These acts of retaliation were done at Major Dixon's request and behest, Dr. Bardell's order to RNP Johnson, and RNP Johnson's compliance and writing of the final order on my Form MSF-207.

The actions by Major Dixon, Dr. Bardell, and RNP Johnson were done in retaliation for Plaintiff's filing numerous grievances containing their names, for filing a formal grievance with the Arkansas Medical Board against Dr. Bardell, for refusing to cooperate with Major Dixon against staff, and for exercising her first amendment rights to freedom of speech, redress of the

government, and access to the Courts. ADC, CMS, and other Defendants are aware of Major Dixon, Dr. Bardell, and RNP John's actions and either silently encouraging or turning a blind-eye to these actions. These actions are retaliatory and amount to inadequate medical care. These actions are mean-spirited and vindictive towards Plaintiff.

This is addressed in grievances: McP-04-1250, McP-04-1259 and McP04-1278-713.

32. Lt. Loftis brought Petitioner a copy of two (2) medical slips, one is the voided MSF-207 and one is for a non-wool blanket and extra feminine hygiene pads. The voided medical slip reflects that Plaintiff's medical restriction were discontinued on 7/30/04 after the MDR #2 was written for Plaintiff's refusing to move on 7/29/04 to a place that does not meet Arnold's then and currently valid medical restrictions.

Lt. Loftis told Plaintiff what occurred between Major Dixon, Dr. Bardell, and RNP Johnson.

Major Dixon, Dr. Bardell, and RNP Johnson were attempting to inflict injury or death upon Plaintiff for numerous reasons including filing of prison grievances, refusing to provide statements against Captain Black, filing a complaint against Dr. Bardell with the Arkansas Medical Board, and other reasons.

Petitioner documented these allegations and provided them to Internal Affairs (ADC), James Gibson, and others, on August 2, 2004.

Petitioner has not provided James Gibson (Internal Affairs and Disciplinary 2nd level appeal] Administrator) with all requested assistance. As a result, Mr. Gibson affirmed Plaintiff's second level appeal after an extended period (not within 5 calendar days set forth in AR831).

33. On August 4, 2004, Plaintiff went to MDR Court on MDR #2 in front of a white, male DHO from the Grimes Unit (Defendant Lt. John Doe). Mr. Bradshaw provided a letter to

security in support of MDR #2 containing materially and intentionally false statements, as reflected on Plaintiff's corresponding F-831-2 form. These false statements were made so as to retaliate against Plaintiff and undermine procedural her due process rights to present evidence or her behalf. The false content of this letter was created to conceal the inadequate medical care being given to plaintiff from MCS, ADC, Dr. Bardell, RNP Johnson, Dr. Max Mobley, Dr. J. Roland Anderson, John Byus Larry Norris, Larry May, Warden Maple, Major Dixon, James Gibson, and others. See grievances: McP-04-1259, McP-04-1250, and McP-04-1278.

Defendant Lt. John Doe violated Plaintiff's procedural due process rights under *Wolff v McDonald*, 94 S. Ct. 2963, (1974), to present evidence on her behalf by not reviewing and considering Plaintiff's medical records and accepting a false statement by Defendant Bradshaw as truthful. Defendant Lt. John Doe relied on this procedural due process violation and found Plaintiff guilty of the MDR which resulted in Plaintiff being reduced to Class IV, punitive segregation for 15 days, loss of 60 days good time, other sanctions, and further loss of her guaranteed parole date.

Defendants Maple, Gibson, Norris, and ADC affirmed on appeal despite the *Wolff* and other procedural and due process violations.

34.    Plaintiff's procedural due process claims do not require the disciplinary decision to be invalidated as her procedural due process rights were clearly established in *Wolff* and intentionally violated by Defendants Lt. John Doe, Maple, Gibson, Norris, and ADC.

Plaintiff expressly states that she seeks relief in the form of more monetary damages only, and not restoration of good time, class, etc. which can be challenged by other means if Plaintiff should so choose.

Plaintiff's *Wolff* claims do not "call into question the lawfulness of Plaintiff's continuing confinement", and claims that Defendants used the wrong procedures, rather than reaching the wrong result. Armento-Bey v Harper, 68 F. 3d 215 (8th Cir. - 1995).

35.    Plaintiff transported to UAMS for an urodynamic study by Sgt. York and Cpl. Roberts. During the study slight to moderate leakage was noted based on the amount of fluid in Plaintiff's bladder and the position she was in (i.e. laying, standing, etc.). The tech noted bladder spasms and felt Plaintiff's abdomen to verify the reading on the screen. Per Dr. Kumar's notes, Plaintiff was to return for consultation after this test but Dr. Bardell denied this order as noted later.

36.    On September 16, 2004, Plaintiff was taken to Newport Hospital for an ultrasound of her right axilla. This was initially performed initial by a tech who found an abnormal structure. Then, Dr. Mufiz Chauhan came in and performed the ultrasound himself and took measurements of an extremely, enlarged lymph node thought to be an unspecified lymphoma. Dr. Chauhan stated that the lymph node was "kidney shaped" and measured 3.4 cm x 5 cm. Dr. Chauhan told Plaintiff that the lymph node must be removed to be properly biopsied. Dr. Chauhan went as far as to tell Plaintiff that she was a "dead woman walking" if something was not done soon.

37.    Plaintiff immediately notified Tom Bradshaw and others of the results to no avail.

38.    On September 20, 2004, Plaintiff filed an emergency grievance regarding receiving inadequate medical care, deliberate indifference, and alleging it to be a physical abuse by ADC, CMS, Dr. Bardell, RNP Rachelle Johnson, Tom Bradshaw, Dr. J. Roland Anderson, Dr. Gabriel Peal, Dr. Max Mobley, John Byus, Larry May, Larry Norris, Warden Maple, Major Dixon, James Gibson, and other unknown persons. See grievance # McP-04-1388.

At the time of the filing of the grievance, ADC, CMS, Dr. Bardell, RNP Johnson nor any other person had ordered even the most basic lab work. [CBC with differential, T-cell count etc.].

39.     On September 22, 2004, Sgt. Nettie Williams and another ADC Officer transported Plaintiff to Dr. Peal's Office at the Southwest Hospital complex. During this visit, Dr. Peal pinched the lump in Plaintiff's right axilla causing Plaintiff excruciating and unnecessary pain, while calling it a "fat pocket" and a "lipoma." [This caused the lump to become extremely tender, painful to touch, warm to touch, and to metastasize to Plaintiff's left axilla, through out her breasts, chest, rib cage, and right groin.]

Plaintiff told Dr. Peal what the Newport Radiologist [Dr. Chauhan] had stated to her regarding the size of the lump, that it was an unspecified lymphoma characterized by an enlarged lymph node/tumor, that Dr. Chauhan said it needed to be completely removed for a proper biopsy, and that Plaintiff was a "dead woman walking" if something was not done immediately to provide her care.

Dr. Peal showed Plaintiff on his index finger what size 3.5 cm by 5 cm is and told Plaintiff that he could not possibly miss an enlarged lymph node that size. Dr. Peal told her that what she was stating was merely 'word of mouth' and unsupported by documentation. He told her " not lymph node, ... not lymph node, ... Lipoma!."

Plaintiff was shocked that Dr. Peal would insinuate that she was making it up. Plaintiff confronted Dr. Peal about whether he had bothered to look at the radiology report for the ultra sound done "last week". He had no knowledge of an ultrasound being done "last week". He responded "there was an ultrasound done last week?" He went to Plaintiff's medical file, found, and began reading the report out loud until he said, "enlarged lymph node". Dr. Peal turned

around giving Plaintiff a dumb look and scratched his head. Plaintiff showed Dr. Peal exactly where the lymph node was.

Dr. Peal stated that the wanted to find it himself based on landmarks. He had Plaintiff to place her hands behind her head so he could find the lymph node himself. It took Dr. Peal 7 to 10 minutes of palpitation and comparing of landmarks before he exclaimed to have found the lymph node. Dr. Peal verbally acted like it was not a big deal, but his facial expression showed otherwise. His verbal and non-verbal actions were obviously incongruent. Dr. Peal's non-chalant attitudes toward the enlarged lymp node is unacceptable.

Dr. Peal missed the enlarged lymph node in May of 2004, despite Dr. Scott diagnosing it as being in the "lymphatics." Dr. Peal did not order or perform a biopsy of the lymph node in May despite Dr. Scott's order for one in April of 2004. A period of 5 months had passed before Dr. Peal considered preforming a biopsy ordered by Dr. Scott of Diagnostic Unit. This constitutes malpractice and inadequate medical care. Dr. Peal told Plaintiff that he was ordering a mammogram with the results to be faxed. He said that, if the results were normal, that he would next see her when he removes the lymph node.

Plaintiff has literally begged the Defendants to do a biopsy, to no avail.

40.     On September 15, 2004, Dr. Bardell wrote the following order: " Per security, obtain urine pregnancy test"

Plaintiff was called to medical, and RNP Pigg requested Plaintiff to provide a urine sample in a cup for a pregnancy test. Plaintiff refused and made it clear to RNP Pigg [CMS Director of Nursing] that she would not submit to a pregnancy test at any time. RNP Pigg had Plaintiff sign a refusal of medical services [AMA] form, which she did. Plaintiff made it clear on this form that she would not submit to any pregnancy test-period!

Also, on this date, Dr. Peal ordered an ultrasound ASAP, per Tom Bradshaw progress notes.

41.    Plaintiff put Dr. Peal and other Defendants on notice of her intent to file this instant complaint and has begged for a referral for a second opinion per ADC/CMS policy, procedure, and contract, to no avail.

On September 23, 2004, Plaintiff talked to Tom Bradshaw and explained that she did not want to see Dr. Peal and why. Plaintiff also received a request back from Mr. Bradshaw on this. A mammogram was done on this date at Harris Hospital.

42.    On October 11, 2004, Dr. Bardell wrote the following order: "CBC ĉ (with) chem profile, pHCG ASAP. Talk ĉ (with) me before you draw the blood. D/C extra pads."

43.    On October 12, 2004, Plaintiff was called to medical by Dr. Bardell for the purpose of discontinuing her medical slip for extra feminine hygiene pads despite stress urinary incontinence, bladder spasms, frequent urination, and urinary retention. Dr. Bardell falsely claimed that Plaintiff's urodynamic study of her bladder performed at UAMS was "normal", and she did not need them. He sent Plaintiff back to her barracks to get her medical slip. Plaintiff brought a copy of it to medical, gave it to them, and left. Shortly later, Dr. Bardell had Monica Alcorn call Sgt. Gay requesting Gay to "shake down" Plaintiff for her legal medical document. Sgt. Gay searched Plaintiff's belongings to no avail. Monica Alcorn called two (2) more times (3 times total) and Sgt. Gay searched Plaintiff each time. Plaintiff filed grievance #McP-04-01443, which she has yet to receive a response on.

Dr. John Daugherty called Dr. Max Mobley about the harassing shakedowns on Plaintiff and the lack of medical care being received by Plaintiff. Dr. Mobley assured Dr. Daugherty that Mobley would look into the problem. Nothing came of this.

44.     On October 13, 2004, Plaintiff refused to go on a medical trip to see Dr. Peal, as she had already expressed her desire for a second opinion and not to see Dr. Peal.

Plaintiff wrote grievance #McP-04-1444. Plaintiff is concerned that Defendants will destroy the enlarged lymph node upon excision without a proper biopsy from a hematopathologist.

So as to conceal their failure to provide adequate medical care and limit their liability such conduct will constitute spoliation of evidence. Plaintiff wants the lymph node available for testing/retesting at Plaintiff's expense by a hematopathologist or accredited lab of her choice.

Plaintiff made it very clear to Defendants that she was not refusing medical care, just that provided by Dr. Peal for said reasons, including Dr. Peal having an economic interest in the outcome of Plaintiff's diagnosis, treatment, prognosis, and ultimate outcome.

45.     On October 15, 2004, at approximately 7:00 a.m. Plaintiff went to medical to have her fasting blood drawn (NPO after midnight). When she arrived and was finally called to the lab draw room, CNA Monica Alcorn was laying the supplies out. Plaintiff asked Alcorn what tests were being drawn. Alcorn responded "CBC and metabolites".

Plaintiff asked Alcorn if the CBC was with differential, and Alcorn responded "yes".

Plaintiff specifically asked Alcorn if any of the lab tests were for pregnancy, and Alcorn responded that none of the ordered tests were for pregnancy. Plaintiff made it abundantly clear that she did not want a pregnancy test also referred to as "Hêg." Alcorn assured Plaintiff that none of the tests were for pregnancy.

Alcorn drew the lab, placed the tubs in the bags with labels, and sealed the bag.

46. On October 21, 2004, Plaintiff went to the Classification Committee. While waiting in line, the Officer told Plaintiff to come to Medical after she left "Classification", which Plaintiff did.

Plaintiff was taken to the last exam room which is commonly referred to as the "emergency" room. Two untrained nursing assistants performed an audiogram on Plaintiff and printed out the results. Plaintiff looked at the results which obviously indicated loss of hearing in the right ear. Plaintiff innocently asked the nursing assistant (one being Monica Alcorn) what the results were. Alcorn responded that she would show them to Dr. Bardell and let him decide, and she left with the results in hand. Approximately one minute later, Alcorn returned to the room, told Plaintiff that the results were normal, and told Plaintiff that she could leave.

Plaintiff left medical without being examined by Dr. Bardell, RNP Johnson, or any licensed medical personnel. This will be reflected on the videotapes.

Plaintiff knew that she has hearing loss in her right ear and that the results were Not normal. Plaintiff later wrote a grievance on this after reviewing her chart and discovering that Dr. Bardell had documented a "normal" audiogram result on her on October 21, 2004. See Grievance #McP-04-1474.

Plaintiff had complained of hearing loss in the right ear. Upon exam, Nurse Gentry had noted a bulge in Plaintiff's right ear.

47.     On October 26, 2004, Plaintiff was called to medical to "consult" with Dr. Bardell. In reality, this turned out to be a session in which he provided false information to Plaintiff that her blood results were "normal, normal, normal," and that Plaintiff did not have Hodgkins Lymphoma, any Non-Hodgkin's lymphoma (NHL), nor any other cancer or ailment. Dr. Bardell went as far as to tell Plaintiff that the lump in her right axilla is nothing more than a "lipoma" (a fatty tumor). Plaintiff reminded Dr. Bardell of the results of the 9/16/04 ultrasound. Dr. Bardell claimed that it was incorrect and that Plaintiff somehow "tailored" the results. Such an implication was absurd.

Dr. Bardell primarily relied the lab results as his reasoning for giving Plaintiff a clean bill of health. These lab results will become very controversial during the proceedings to come.

Plaintiff asked for a second opinion by a Board certified surgeon who could perform the surgery and for an oncology consult per policy, procedure, and ADC/CMS contract. Dr. Bardell refused stating that Plaintiff had received multiple opinions, when in fact she had not. Dr. Peal was the only surgeon capable of performing the surgery who examined Plaintiff. The following are the physicians whom have provided care to Plaintiff:

**DR. SCOTT:**     4/5/04- Diagnosed with problems with lymphatics. Ordered!
Surgery consults, lumpectomy, biopsy, ultrasound.

**DR. PEAL:**     5/5/04- Diagnosed with "lipoma," ordered ultrasound and MRI.

**DR. T. ODDSON:**    5/5/04- Performed ultrasound of <u>right</u> axilla – Did <u>NOT</u> diagnosis with lipoma. Deemed ultrasound to be "suspicious" and called Dr. Peal and recommended MRI.

**DR. M. CHAUHAN:** 5/24/04- Read a MRI and missed the enlarged lymp node. 9/16/04- Performed an ultrasound a found an enlarged lymph node indictive of an unspecified lymphoma and recommended a biopsy.

**DR. PEAL:**    9/22/04- Initially diagnosed with a "lipoma" until confronted by the 9/16/04 ultrasound report, then diagnosed with an enlarged lymph node. Recommended a complete excision/dissection/lumpectomy with a biopsy.

**DR. SCOTT:**    1/26/05 cleared Plaintiff medically

If any other physician has examined Plaintiff on behalf of CMS, it was done with ESP without Plaintiff present.

Plaintiff has written a number of grievances on this including, but not limited to grievance's #'s: <u>McP-04-1497, McP-04-1498, McP-04-0402-600, McP-04-536-600, McP04-779-600, and McP-04-1388-900.</u>

Dr. Bardell made it very clear to Plaintiff that she could see Dr. Peal or die, that it was her choice.

Dr. Bardell <u>forced</u> Plaintiff to sign a refusal of services form (AMA) against her will. Dr. Bardell wrote it out making it to falsely appear that Plaintiff was refusing medical care when she was not. Dr. Bardell would not let Plaintiff leave until she signed it and threatened to write Plaintiff a disciplinary report if she refused to sign. Plaintiff reluctantly signed the document, but not until she added to the form making it clear that she was <u>not</u> refusing medical care only that provided by Dr. Peal. Dr. Bardell refused to permit Plaintiff to use her medical insurance (Tri-Care) to receive proper care by another physician.

As a result, Defendants have provided inadequate medical care to Plaintiff. This has

caused mental, physical, and emotional distress and abuse upon Plaintiff. It constitutes cruel and

unusual punishment and has denied Plaintiff due process under all governing policies,

procedures, and the ADC/CMS contract.

This is a common practice by CMS to make a larger profit at the expense of the Plaintiff

and the taxpayers who are lining the corporate pockets of CMS to provide inadequate medical

care. CMS promotes this practice and philosophy by providing bonuses and pay raises to the

physicians, medical directors, medical administrators for cutting the medical care, and

corresponding costs to save CMS money and provide for an increased profit.

48. On October 27, 2004, Plaintiff examined her medical jacket and took extensive

notes during the short period allowed for such review. Plaintiff discovered the misconduct and

lies told by Dr. Bardell, Monica Alcorn, and others. Plaintiff also discovered that Dr. Bardell

ordered a pregnancy test and Plaintiff's blood was allegedly drawn to run the said test as such a

result was reflected in Plaintiff's medical chart.

Plaintiff signed a "refusal" form [AMA] on 9/15/04, refusing to submit to a pregnancy

test. On 9/15/04, the pregnancy test was in the non-invasive form of a urine test. However,

Plaintiff made it clear that she was refusing to comply with any request for pregnancy test.

On October 14, 2004, Plaintiff's blood was drawn for a pregnancy (HCG) test despite

Plaintiff's prior refusal to submit to it was made in writing and plaintiff making it clear to

Monica Alcorn that she was not submitting to a pregnancy test. Monica Alcorn lied about what

tests were being drawn and drew the blood against Plaintiff's explicit instructions without

Plaintiff's informed consent. This constitutes assault, battery, and an illegal search and seizure. Plaintiff wrote a grievance on this. See grievance #McP-04-1473.

49.     Since these times, Plaintiff has been examined by RNP Rachelle Johnson for swelling in her left axilla, right groin, neck, under ears/behind jaw, and other lymph nodes as well Plaintiff's right axilla. RNP Johnson told Plaintiff that the lymph nodes were definitely swollen. She said, "I will see what I can do, but I have to go through Dr. Bardell."

At a later date, Plaintiff asked RNP Johnson the status of any referrals related to the swollen lymph nodes. Johnson said that she told Dr. Bardell, and he was supposed to call Dr. Anderson.

Plaintiff wrote a request that Tom Bradshaw responded back to. Mr. Bradshaw alleges that RNP Johnson did not find swelling in the left lymph nodes and that RNP Johnson will continue to "monitor" Plaintiff's condition.

Plaintiff's lymph node(s) is swollen large enough to be seen visually without palpation yet these licensed allegedly trained medical professionals cannot find the obvious. This is how Plaintiff's right axilla was in January of 2004, but Defendants refused and failed to provide adequate medical care until it grew extensively and metastacized to the left side.

50.     On December 8, 2004, Plaintiff was seen in medical during a sick call for a lump in her left breast that is extremely tender and painful. Plaintiff was referred to RNP Johnson. This appears to be metastasis or a continuation of whatever disease process Plaintiff has going on.

51.     Plaintiff is more than willing to accept medical care but Dr. Bardell was attempting to force Plaintiff to choose between receiving care from Dr. Peal who has an economic interest [in not providing proper diagnosis, treatment, and adequate medical care because of his previous misdiagnosis and inadequate medical care given to Plaintiff] or receiving no medical care. Since that time, Plaintiff has made it clear that she will see the specialist of Dr. Bardell's choice. However, Dr. Bardell is refusing to provide any medical care to Plaintiff

52.     CMS, Dr. Bardell, and other Defendants have a history of providing inadequate medical care and delaying medical care between when an inmate is diagnosed with cancer and when actual treatment begins that result in the wrongful death of inmates. Dr. Bardell specifically was being sued for the wrongful death of Erin Finley in the U.S. District Court of the Middle District of Pennsylvania and recently settled out of court for $2.1 million. Another wrongful death complaint is pending in the same court against Dr. Bardell. Upon information and belief, the families of Marie Hardiman and Virginia Morris are suing or going to sue Dr. Bardell, CMS and the other defendants for their wrongful deaths secondary to inadequate medical care.

53.     The U.S. Department of Justice [DOJ] is responsible for overseeing the medical care of the McPherson Unit and has actively taken on this role by inspecting the unit and finding that the female inmates are receiving inadequate medical care. The DOJ is over seeing the McPherson Unit of ADC to ensure that Plaintiff and other inmates receive constitutionally guaranteed medical care.

During August of 2004, ADC signed an "agreement" with the U.S. Department of Justice [DOJ] to provide adequate medical care to Plaintiff and other similarly situated female inmates at

the McPherson Unit to avoid being taken to Court on the situation by the DOJ. Despite this agreement, ADC and CMS continue to provide unconstitutionally inadequate medical care to Plaintiff and other inmates at the McPherson Unit. To be exact, Inmate Virginia Morris recently died at UAMS as a result of inadequate medical care at the hands of Dr. Bardell prior to arriving at UAMS.

The U.S. Department of Justice has failed in its duty to adequately supervise ADC, CMS, Dr. Bardell and other Defendants to comply with the "agreement', to evaluate the compliance, and to ensure that Plaintiff receives adequate medical care.

On February 2, 2005, DOJ physician Dr. Fowlkes examined Plaintiff's masses, interviewed Plaintiff, and audited her medical chart.

54.     Plaintiff's serious medical needs continue to go untreated and is in imminent danger of serious physical injury or death at the hands of Defendants.

55.     Since Plaintiff's release from segregation, Plaintiff has acquired additional proof/medical documentation from her medical jacket which medical, Tom Bradshaw, and the Defendants previously denied existing regarding Plaintiff's extreme allergy to wool. However, vindictive ADC, staff, directors, administrators, wardens, medical staff, Major Dixon, and others (including other Defendants) refuse to acknowledge and abide by it. Plaintiff mailed a copy of the documentation to Sr. Warden John Maple Jr. and James Gibson. Sr. Warden Maple responded to Plaintiff's letter in a memorandum dated September 27, 2004, acknowledging receipt. James Gibson (JA) responded back affirming Plaintiff's MDR#2.

Petitioner has extensive medical documentation in her medical jacket of her history of her severe wool allergy, despite the false statements of staff.

Staff member Scott Hearyman was the Classification Officer for a number of years and until immediately prior to Plaintiff's scheduled release from segregation. Currently, he is the SATP counselor. Mr. Hearyman personally had Plaintiff retested for her wool allergy at least three (3) times by physicians for which it stood, while he was the Classification Officer. Furthermore, Mr. Hearyman is a LPN and qualified to testify to the procedure used to test Plaintiff and the results.

Plaintiff is currently experiencing a number of medical problems for which the medical department is providing constitutionally inadequate medical care. Plaintiff has been diagnosed with an enlarged (right axilla) lymph node indictive of an unspecified lymphoma or other cancer or illness and has multiple other masses for which she is being denied basic care.

56.     From approximately February of 2005, until April 2005, Defendant Inmate Georgia Weaver attempted to have Plaintiff moved out of the medical/non-wool barracks #14 by writing requests to Staff containing false information, to no avail.

57.     During late April of 2005, Defendant Georgia Weaver [a serial killer] falsely claimed to ADC security staff and CMS medical staff that she overhead Plaintiff talking to Inmate Terese Meadows about taking out a "hit" on Defendant Dr. Bardell.

58.     On Friday, April 22, 2005, Defendant Major Dixon and Warden Capel conducted a internal investigation of Weaver's allegations and cleared Terese Meadows and Plaintiff of any

began planning her defense and marshalling the facts, as this not a valid rule violation under AR
831.

Under AR 831, Page 8, the Rule Violation reads:

12-1 failure to obey verbal and/or written orders of staff.

71.    On Thursday, July 28, 2005, Defendant Disciplinary Hearing Officer Phillip
Cargill presided over Plaintiff's MDR hearing. During this hearing, Plaintiff argued that the
MDR was defective because her written "Notice of Charges" contained a non-existent charge.
Defendant Cargill did not want to hear Plaintiff's arguments regarding procedural, factual,
liberty interest, and Due Process violations. He repeatedly interrupted Plaintiff during her
statement asking "what is your defense?," when Plaintiff was presenting her defense.

Plaintiff attempted to educate Defendant Cargill regarding the requirements set out in the
U.S. Supreme Courts decision in *Wolff*, and presented a copy to him for his review. Defendant
Cargill repeatedly cut off Plaintiff's statement rolled his eyes handed the opinion back to
Plaintiff, and made it clear that Defendant Cargill did not care about the relevant law that it did
not control him.

72.    Subsequently, Defendant Cargill found Plaintiff guilty of a charge that she did not
receive any written notice of much less the 24-hour minimum set out in *Wolff*. Defendant Cargill
reduced Plaintiff to a Class IV, sentenced her to 30 days Punitive Segregation, and restricted her
commissary and phone privileges for 30 days. This also restricted Plaintiff's visitation with her
three (3) children to not visitation for 30 days and only twice a month until she receives her Class
1C back (approximately 6 months). This violates Plaintiff's procedural, factual, liberty interest,
and Due Process protections.

73.     Plaintiff had a parole date of September 6, 2007, for which she was guaranteed parole under Arkansas law.  That parole date has changed as a result of this MDR.  This MDR also affects Plaintiff's ability to participate in the Wrightsville Work-Release Program, to receive its economic interests, and to receive the liberty interests associated with its furloughs.

74.     IF Defendants Maple, Gibson, Norris, and ADC do not apply *Wolff* in the appeal process of this MDR, it is in retaliation for filing grievances and seeking redress in the courts and violates Plaintiff's Procedural Due Process rights.

75.     Plaintiff's Procedural Due Process claims do <u>not</u> require the disciplinary decision to be invalidated as her procedural due process rights were clearly established in *Wolff* and intentionally violated by Defendant Cargill and possibly Defendants ADC, Maple, Gibson, and Norris (to be determined).

Plaintiff expressly states that she seeks relief in the form of monetary damages only and not restoration of good time, class, etc. which can be challenged by other means if Plaintiff should so choose.

Plaintiff's *Wolff* claims do not "call into question the lawfulness of Plaintiff's continuing confinement," and claims that Defendant(s) used the wrong procedures, rather than for reaching the wrong result.  *Armento-Bey v Harper, 68 F. 3d 215 (8th Cir-1995)*

Plaintiff's *Wolff* procedural due process claims stand regardless of the final disposition of the disciplinary decision.  Defendant ADC's inmate grievance policy prohibits Plaintiff from grieving a disciplinary action so she has exhausted her administrative remedies.

## STATEMENT OF CLAIM

### COUNT 1:   ASSAULT
(See grievances)  (MP02-4570 and McP-02-4571)

76.     Plaintiff incorporates by reference paragraphs 1 – 75.

77.     Defendant Major Linda Dixon committed the tort of assault upon Plaintiff by attempting to, threatening to or actually inflicting injury on Plaintiff while possessing a present ability to do so, and intentionally displaying or using force so as to give Plaintiff a reason to fear or expect immediate bodily harm.  Specifically during December of 2002, Major Dixon had Dr. Sone discontinue Plaintiff's "closed pod" medical restriction (while her non-wool environment restriction remained valid) and Dixon immediately ordered that Plaintiff be placed in an open pod (Barracks #14) which contained wool blankets.  This violated Plaintiff's valid medical restriction for "non-wool environment".  Plaintiff had a severe generalized allergic reaction, suffers from scarring on her face and body, and likely had an autoimmune reaction that may have contributed to her current medical problems.  This assault caused grievous and serve physical and psychological damage to Plaintiff, from which she has suffered since the incident and from which she will continue to suffer in the future.

78.     Defendants Sr. Warden John Maple and Arkansas Department of Correction (ADC) negligently caused the assault by failure to properly train, supervise and control the conduct of Defendant Major Linda Dixon.

79.     At the time of the commission of the tort assault, Defendant Major Linda Dixon was acting within the scope of her employment.  Therefore, under the doctrine of *respondeat superior,* Defendants Maple and ADC are responsible for their conduct as well.

**COUNT 2:   BATTERY**

(See grievances) (McP02-4570 and McP-02-4571)

80.    Plaintiff incorporates by reference paragraphs 1 through 79.

81.    Defendant Dixon committed the tort of battery upon Plaintiff by causing her to
suffer an allergic reaction, injury, and scarring or recklessly using force upon her. This battery
caused grievous and severe physical and psychological damage to Plaintiff [from the December
of 2002 incident] from which she will continue to suffer in the future.

82.    Defendants Sr. Warden John Maple and ADC negligently caused the battery by
failure to properly train supervise and control the conduct of Defendant Major Linda Dixon.

83.    At the time of the commission of the tort of battery, Defendant Major Linda
Dixon was acting within the scope of her employment. Therefore, under the doctrine of
*respondent superior,* Defendants Maple and ADC are responsible for their conduct as well.

**COUNT 3:   ASSAULT**

(See grievances McP-04-1250, McP-04-1259, and McP-04-1278)

84.    Plaintiff incorporates by reference paragraphs 1 through 83.

85.    Defendants Major Linda Dixon, RNP Rachelle Johnson, and Dr. Craig Robert
Bardell, M.D., committed the tort of assault upon Plaintiff by attempting to, threatening to, or
actually inflicting injury on Plaintiff while possessing a present ability to do so, and intentionally
displaying, threatening, or using force so as to give Plaintiff a reason to fear or expect immediate
bodily harm. Specifically, on July 29, 2004, Major Dixon requested Dr. Craig Bardell and RNP
Rachelle Johnson to discontinue Plaintiff's valid "closed pod" and "non-wool environment"
medical restrictions. This was done without physically re-examining Plaintiff or properly
assessing Plaintiff's medical history as documented in her medical charts. Simply interviewing

Scott Hearyman (prior classification Officer) would have verified Plaintiff's severe wool allergy history or examining her medical charts. Defendants Dixon, Bardell, and RNP Johnson reasonably should have been aware of the ramifications of their actions but continued regardless. Defendant Dixon then ordered Ms. Dykes (Classification Officer) to place Plaintiff in Barracks #14, which was full of wool blankets. Defendant Dixon ordered security staff to threaten Plaintiff with disciplinary action if Plaintiff refused to move to Barracks #14 and to in fact write Plaintiff a Major Disciplinary Report (MDR=disciplinary) for refusing to move to Barracks 14 to avoid physical injury.

Had Plaintiff moved to Barracks #14. She would have inevitably had a severe generalized allergic reaction, suffered from further scarring on her face and body, and would likely have had an autoimmune reaction that may contribute to or further escalate her current medical problems. This assault caused grievous and severe physical and psychological damage to Plaintiff, from which she has suffered since the incident and from which she will continue to suffer in the future.

86.     Defendants CMS, ADC, Dr. Bardell, Dr. J. Roland Anderson, Tom Bradshaw, Maple, Dr. Mobley, John Byus, Larry Norris, Larry May, James Gibson, and other John and Jane Does negligently caused the assault by failure to properly train supervise and control the conduct of defendants Dixon, RNP Johnson, and Dr. Bardell.

87.     At the time of the commission of the tort assault, Defendants Dixon, RNP Johnson, and Dr. Bardell were acting within the scope of their employment. Therefore, under the doctrine of *respondeat superior,* Defendants CMS, ADC, Dr. Anderson, Bradshaw, Maple, Dr. Mobley, Byus, Norris, May, Gibson, and other John and Jane Does are responsible for their conduct as well.

**COUNT 4:   BATTERY**
(See grievances McP-04-1250, McP-04-1259, and McPa-04-1278)

88.    Plaintiff incorporates by reference paragraphs 1 through 87.

89.    Defendants Dixon, RNP Johnson, and Dr. Bardell committed the tort of batter

upon Plaintiff by causing her to suffer an allergic reaction, injury, and/or scarring or recklessly

reaction, injury, and/or scarring or recklessly using force upon her. This battery caused grievous

and severe physical and psychological damage to Plaintiff [form the June 29, 2004, incident]

from which she will continue to suffer in the future.

90.    Defendants CMS, ADC, Dr. Anderson, Tom Bradshaw, Maple, Dr. Mobley John

Byus, Norris, May, Gibson, and other John and Jane Does negligently caused the battery by

failure to properly train, supervise and control the conduct of Defendants Dixon, RNP Johnson,

and Dr. Bardell.

91.    At the time of the commission of the tort of battery, Defendants Dixon, RNP

Johnson, and Dr. Bardell were acting within the scope of their employment. Therefore, under

the doctrine of *respondent superior* Defendants CMS, ADC, Dr. Anderson, Bradshaw, Maple,

Dr. Mobley, Byus, Norris, May, Gibson, and other John and Jane Does are responsible for their

conducts as well.

**COUNT 5:   INADEQUATE MEDICAL CARE** (DELIBERATE INDIFFERENCE)
(See Grievances: McP-02-4570, McP02-02457, McP-04-289-600, McP04-398-600, McP-04-402-600, McP-04-536-600, McP-04-779-600, McP-04-1250, McP-04-1259, McP04-1278, McP-04-1388, McP-05-00039-600, and McP-05-00333)

92.    Plaintiff incorporates by reference Paragraphs 1 through 91.

93.    Defendants Dr. Craig R. Bardell, RNP Johnson, Monica Alcorn, Dr. Gabriel Peal,

M.D., Dr. Mufiz Chauhan, Dr. Max Mobley, John Byus, Dr. J. Roland Anderson, M.D., Major

Dixon, CMS, ADC, Gibson, Maple, Norris, May, and other John and Jane Does have provided inadequate medical care to Plaintiff, showing deliberate indifference to her medical needs and medical restrictions.

94.     During December 2002, Major Dixon, Warden Maple and ADC provided inadequate medical care to Plaintiff by refusing and/or failing to comply with Plaintiff's medical restriction for a "non-wool environment" by placing Plaintiff into Barracks 14 which was full of wool blankets and violated Plaintiff's valid medical restriction. (See grievances McP-02-4570 and McP-02-4571) (See also Count 1 and 2).

95.     On and after July 29, 2004, Defendants Dr. Bardell, RNP Johnson, Dixon, CMS, ADC, Max Mobley, Maple and Bradshaw provided in adequate medical care to Plaintiff by: Dixon requesting Defendants Bardell, Johnson, and Bradshaw to discontinue Plaintiff's medical restrictions for "closed pod" and "non-wool environment;" Defendants Bardell, Johnson, and Bradshaw telling Dixon that Plaintiff could be placed in an "open pod" with wool blankets without harm to Plaintiff; Defendants Bardell, Johnson, and Bradshaw eventually discontinuing those medical restrictions without a physical re-evaluation of Plaintiff; Defendant Dixon trying to place Plaintiff in an "open pod" full of wool blankets (7/29/04); Defendant Dixon obtaining false statements from Tom Bradshaw, Dr. Bradell, RNP Johnson, and other unknown persons to justify writing and affirming the MDR; Defendants Warden Maple, Gibson, Norris, May, Dr. Mobley, John Byus, ADC, CMS and Bradshaw investigated the incident during the grievance and disciplinary appeal proceedings and permit this inadequate medical care to continue and condoned the practice by affirming the disciplinary (MDR#2). (See grievances: McP-04-1250, McP-04-1259, and McP-04-1278) (See also Counts 1 and 2).

96.     From July 1, 2001, to date, Defendants CMS, ADC, Dr. J. Roland Anderson, Dr. Bardell, RNP Johnson, Dixon, Dr. Mobley, John Byus Bradshaw, Maple, Gibson Norris, May,

and other John and Jane Does provided inadequate medical care to Plaintiff by: failing to

provide proper diagnosis and treatment of Plaintiffs bladder problem, (vaginal cystocele, bladder

spasms, urinary retention, stress incontinence, etc.); Dr. Bardell discontinuing Plaintiff's medical

restriction for extra pads despite documented stress incontinence with leakage; Dr. Bardell

DISCONTINUING Plaintiff's Ditropan 10 mg P. O. BID and refusing to renew it after Plaintiff

took the Urodynamic study; refusing to provide the required bladder surgery to fix the vaginal

cystocele and associated symptoms; Defendants Maple, Gibson, May Dixon Norris, Mobley,

ADC, CMS, Bradshaw, Dr. J. Roland Anderson, Byus, and U.S. Department of Justice

investigated this complaint and related incidents during the grievance proceedings and either

actively encouraged and permitted this inadequate medical care to continue or passively turned a

blind-eye to it; failing to take action despite Plaintiff personally contracting said Defendants or

their agents in-person by letter or by grievance; and Defendant U.S. Department of Justice failing

to follow through investigating the matter, and failing to enforce the August 2004, "agreement"

with ADC in this matter. (See grievances: McP-04-398-600, McP-04-402-600, McP04-536-600,

and McP-04-799-600).

    97.    From July 1, 2001, to date Defendants CMS, ADC, Dr. Anderson, Dr. Bardell,

RNP Johnson, Dr. Scott, Dr. Gabriel Peal, M.D., (Surgeon), Dixon, Dr. Mobley, Byus, Alcorn,

Bradshaw, Gibson, Norris May, Maple, and other John and Jane Does provided inadequate

medical care to Plaintiff as follows:

    **Defendant Dr. Gabriel Peal (Surgeon):** misdiagnosed Plaintiff with a "lipoma",
committed assault and battery upon Plaintiff by pinching Plaintiff's right axilla lump on
two occasions (5/5/04 and 9/22/04), which caused extreme pain, swelling and an increase
in the size of the lump/lymph node and probable metastasis; failed to promptly order and
perform the biopsy recommended by Dr. Scott (4/15/04); failed to order an oncology
consult; failed to aggressively pursue a lumpectomy with biopsy as recommended by Dr.
Scott; failed to order lab work, P.E.T. and CT, scans, and other definitive testing to

properly diagnose Plaintiff; delaying Plaintiff's medical care; failed to provide prompt proper diagnosis and aggressive treatment for Plaintiff; enlarged lymph nodes(s) and probable diagnosis of cancer; failed to seek a second opinion related to Plaintiff's MRI films after Plaintiff notified him of the error in the MRI report: and for other acts;

**Defendant Dr. J. Roland Anderson:** misdiagnosed Plaintiff with a "lipoma", failed to follow-up on Plaintiff's medical care, failed to require the biopsy recommended by Dr. Scott be performed, failed to seek a second opinion or that Dr. Chauchan re-evaluate Plaintiff's MRI film after Plaintiff notified him of the error in the MRI report, employs and encourages cost saving efforts that amount to inadequate medical care, sent Plaintiff to Dr. Peal to suffer assault and battery upon her person by Dr. Peal, failed to provide proper diagnosis and medical treatment for Plaintiff's probable diagnosis of cancer, is directly responsible for the actions and inactions of CMS, Dr. Peal, Dr. Bardell, RNP Johnson and others as it relates to Plaintiff's care, and for other acts;

**Defendant Dr. Craig Robert Bardell, M.D.:** refused to evaluate Plaintiff's right axilla lump on or about 1/15/04; misdiagnosed Plaintiff with a "lipoma"; has denied Plaintiff a biopsy ordered by Dr. Scott on or about 4/15/04; failed to promptly order and refer for a biopsy; failed to order an oncology consult; failed to aggressively pursue a lumpectomy with biopsy as recommended by Dr. Scott; failed to order and perform proper lab tests, P.E.T. and CT scans, and other definitive testing to properly diagnose Plaintiff; delaying Plaintiff's medical care; failed to provide prompt and aggressive treatment for Plaintiff's enlarged lymph node (s) and probable diagnosis of cancer; failed to seek and provide a second opinion related to Plaintiff's MRI films after Plaintiff notified him of the error in the MRI report; refused and failed to refer Plaintiff to a second surgeon (who is capable of performing the necessary surgery) for a second opinion in violation of policy, procedure, and the ADC/CMS contract; conspiring to obtain a sample of Plaintiff's blood for a pregnancy test (Hcg) Plaintiff's prior explicit refusal to submit to the test by conducting a illegal search and seizure of Plaintiff's blood and bodily fluids; discontinuing Plaintiff's medical restriction without a factual basis; acts of retaliation; conspiracy; and for other acts.

**Defendant Monica Alcorn:** intentionally lied to and deceived Plaintiff with regard to what lab test were ordered by Defendant Bardell and being drawn by Defendant Alcorn on the morning of October 15, 2004, without Plaintiff's informed consent, in violation of policy, procedure, and Plaintiff's constitutional rights not to be subject to unreasonable, illegal searches and seizures. In this instance, Defendant Alcorn seized an extra tube of Plaintiff's blood to conduct an exploratory search for evidence of pregnancy or lack thereof (Hcg). Plaintiff specifically asked Alcorn if one of the ordered tests was for "Hcg or pregnancy," for which Alcorn denied. Plaintiff made it clear to Alcorn that she would not permit a pregnancy test and would take legal action if she found that Alcorn drew blood for said test against Plaintiff's right to informed consent and to be free of unreasonable, illegal searches and seizures. This violation was discovered when Plaintiff reviewed her medical Jacket on 10/27/04. Plaintiff wrote a grievance on this. See grievance McP-04-1473.

**Defendant Tom Bradshaw:** intentionally provided false information regarding Plaintiff's medical history and medical care to Defendants Maple, Gibson, Mobley, May, and others to conceal the inadequate medical care being provided to Plaintiff by Defendants RNP Johnson, CMS, and others; failed to notify Dr. Anderson, CMS, ADC, and other upper ranking administrative Defendants of the inadequate medical care being provided to Plaintiff from other Defendants; failed to promptly and aggressively arrange for a lumpectomy and biopsy as ordered by Dr. Scott (4/15/04); delayed Plaintiff's medical care; failed to provided prompt and aggressive treatment for Plaintiff's enlarged lymph node(s) and probable diagnosis of cancer; failed to seek and provide a second opinion related to Plaintiff's MRI films after Plaintiff notified him of the error in the MRI report; refused and failed to refer Plaintiff to a second surgeon (who is capable of performing the necessary surgery) for a second opinion in violation of policy, procedure, and the ADC/CMS contract; instructing Defendant Peal's office not to provide or for wave documents, reports, and other Plaintiff's medical records to Plaintiff's attorney or other persons as requested by Plaintiff of Defendant Peal; retaliation; conspiracy; and for other acts.

**Defendant RNP Rachelle Johnson:** intentionally discontinued Plaintiff's valid medical restrictions without re-evaluating Plaintiff's medically or even visually examining and physically evaluating Plaintiff (closed pod," "non-wool environment", and asthma restrictions); misdiagnosed Plaintiff with a "lipma" in her right axilla; misdiagnosing Plaintiff related to the swollen lymph nodes in Plaintiff's left axilla; failed to promptly and aggressively arrange for a lumpectomy and biopsy as ordered by Dr. Scott (4/15/04); delayed Plaintiff's medical care; failed to provide prompt and aggressive treatment for Plaintiff's enlarged lymph node(s) and probable diagnosis of cancer; failed to seek and provide a second opinion related to Plaintiff's MRI films after Plaintiff notified him of the error in the MRI report; refused and failed to refer Plaintiff to a second surgeon (who is capable of performing the necessary surgery), for a second opinion in violation of policy, procedure, and ADC/CMS contract; failed to order lab work; and other acts.

**DEFENDANT DR. SCOTT:** Initially determined that Plaintiff had lymphoadenopathy and referred Plaintiff for a biopsy, 7ultrasound and surgery consult. After Plaintiff filed Complaint No. 4:05cv00013 JLH/JTR, on January 26, 2005, Dr. Scott cleared her medically despite severe lymphoadenopathy, and refused to provide her with any further medical care. This was likely at the request of unknown Defendants because he initially to Plaintiff that he was going to recommend an outpatient surgery consult in front of two ADC transport Officers and later that same day cleared her medically.

**Defendants Max Mobley, Dr. Bardell, RNP Johnson, Byus, Maple, Gibson, Norris, May, ADC, CMS, Bradshaw, Dixon and other John and Jane Does:** Plaintiff has shown her right axilla lump to Defendants Dr. Bardell, RNP Johnson, Mobley, Byus, Maple, Gibson, May, Dixon, Bradshaw, agents of ADC, CMS, and U.S. Department of Justice to no avail. These defendants investigated this complaint and related incidents during the grievance and disciplinary proceedings and either actively encouraged and permitted this inadequate medical care to continue or passively turned a blind-eye permitting it. These defendants have failed to take action despite Plaintiff personally

contacting Defendants or their agent's in-person, by letter, or by grievance. Defendant U.S. Department of Justice has failed to follow through investigating the matter and to enforce the August 2004, "agreement" with ADC in this matter. (See grievances; McP-04-398-600, McP-04-402-600, McP-04-536-600, McP-04-779-600, and McP04-1388)

98.    Defendants CMS, ADC, Dr. Anderson, Dr. Bardell, RNP Johnson, Maple, Dr. Mobley, Byus, Gibson Norris, May, Bradshaw, Dixon, and other John and Jane Does negligently caused Plaintiff to receive inadequate medical care by failure to properly train, Supervise and control the conduct of Defendants CMS, Dr. Anderson, Dr. Peal, RNP Johnson, Maple, Dr. Mobley, Byus, Gibson, Alcorn, Norris, May, Bradshaw, Dixon and other John and Jane Does.

99.    At the time of the commission of the tort of inadequate medical care, Defendants CMS, Dr. Anderson, Dr. Peal, RNP Johnson, Dr. Scott, Maple, Alcorn, Dr. Mobley, Byus, Gibson, Norris, May, Bradshaw, Dixon and other John and Jane Does were acting within the scope of their employment/contract with Defendant ADC/CMS. Therefore, under the doctrine of *respondeat superior*. Defendants CMS, ADC, Dr. Anderson, Dr. Bardell, RNP Johnson, Maple, Dr. Mobley, Byus, Gibson, Norris, May, Bradshaw, Dixon, U.S. Department of Justice and other John and Jane Does, are responsible for their conduct as well. Defendant U.S. Department of Justice has assumed a position of authority over the defendants by investing the inadequate medical care being provided at the McPherson and entering into an "agreement" in August with Defendant ADC. Defendant DOJ was investigating Plaintiff's medical care in March of 2004, in this matter herein and has failed to investigate Plaintiff's continued lack of medical care and to enforce the August 2004, "agreement" with ADC. DOJ physician Dr. Fowlkes examined Plaintiffs' masses interviewed Plaintiff, examined Plaintiff's documentation; and audited Plaintiff's medical records but has failed to take further actions.

**COUNT 6 AND 7:    ASSAULT  2 COUNTS**
(See grievance McP-04-01388-900)

100.    Plaintiff incorporates by reference Paragraphs 1 – 99

101.    Defendant Dr. Gabriel Peal, M. D., committed the tort of assault upon Plaintiff by attempting or threatening to inflict injury on Plaintiff while possessing a present ability to do so, and intentionally displaying force so as to give Plaintiff a reason to fear or expect immediately bodily harm.  Specifically, on May 5, 2004, (Count 6) and again on September 22, 2004, Defendant Peal while examining Plaintiff for a large tender lump in her right axilla attempted to or threatened to inflict injury by vigorously and painfully pinching/squeezing the lump.  Dr. Scott had already diagnosed the lump with lymphatic involvement and ordered a lumpectomy with biopsy and a surgery consult.  That is how plaintiff found herself at Defendant Peal's mercy.  With such a referral, such an act of arrogance and ignorance from a board certified surgeon can only be seen as an attempt to inflict injury on Plaintiff during the second visit on September 22, 2004, as an ultrasound report from a board certified radiologist reflected that the lump was an enlarged lymph node.  That was the reason Plaintiff was at Defendant Peal's Office when the second count of assault occurred.  Defendant Peal either did not bother to read the ultrasound report or read and ignored it.  Regardless, such an act of arrogance and ignorance from a board certified surgeon can only be seen as an attempt to inflict injury on Plaintiff.  These assaults (Counts 6 and 7) caused grievous and severe physical and psychological damage to Plaintiff, from which she has suffered since the incident and from which she will continue to suffer in the future.

102.    Defendants ADC, CMS, Dr. Anderson, Dr. Mobley, Dr. Bardell, RNP Johnson, Bradshaw, Norris, May, Byus, Gibson, Dixon, Maple and other John and Jane Does negligently caused the assaults by failure to properly train, supervise, and control the conduct of Defendant Peal.  In the alternate, said Defendants are responsible for the assaults by Defendant Peal upon

Plaintiff as said Defendants have legal custody of Plaintiff and a legal obligation to protect Plaintiff from such assaults. Plaintiff personally told Defendants Maple, Dixon, RNP Johnson, Dr. Anderson, Gibson, Bradshaw, and other Defendants in person of the incident after the first assault (count 6) but they failed to take action and permitted Plaintiff to be assaulted by Defendant Peal a second time (Count 7). Plaintiff complained about both assaults in grievance McP-04-1388 to all Defendants to no avail. Plaintiff verbalized these complaints of assault (counts 6 & 7) to Defendants Bardell and RNP Johnson on or about October 26, 2004, and her intent to file instant complaint yet Defendants Bardell and Johnson continued to refuse to refer Plaintiff to any other Surgeon for proper, Professional, competent, constitutionally adequate medical care.

103.    At the time of the commission of the tort of assault (Counts 6 and 7), Defendant Peal was acting within the scope of his employment/contract for services with Defendants ADC and CMS. Therefore, under the doctrine of *respondeat superior,* Defendants ADC, CMS, Norris, May, Dr. Mobley, Byus, Dr. Anderson, Dr. Scott, Dr. Bardell, RNP Johnson, Bradshaw, Maple, Dixon, Gibson, and other John and Jane Does are responsible for Defendant Peal's conduct as well.

## COUNTS 8 AND 9:  BATTERY (2 COUNTS)
(See grievance McP-04-1388-900)

104.    Plaintiff incorporates by reference paragraphs 1 through 103.

105.    Defendant Dr. Gabriel Peal, M.D., committed the tort of battery upon Plaintiff by vigorously and Painfully pinching/squeezing the lump in Plaintiff's right axilla or recklessly using force upon her on two occasions, May 5, 2004, (Count 8), and September 22, 2004, (Count

9). This battery caused grievous and severe physical and psychological damage to Plaintiff, from which she has suffered since the incident and from which she will continue to suffer in the future.

106.    Defendants ADC, CMS, Dr. Anderson, Dr. Mobley, Dr. Bardell, RNP Johnson, Bradshaw, Norris, May, Byus Gibson, Dixon, Maple, Dr. Scott and other John and Jane Does negligently caused the battery (Counts 8 and 9) by failure to properly train, supervise, and control the conduct of Defendant Peal. In the alternate, said Defendants are responsible for the battery (Counts 8 and 9) by Defendant Peal upon Plaintiff as said Defendants have legal custody of Plaintiff and a legal obligation to protect Plaintiff from such battery. Plaintiff personally told Defendants Maple, Dixon, RNP Johnson, Dr. Anderson, Gibson, Dr. Scott, Bradshaw, and other Defendants in person after the first battery (Count 8), but they failed to take action and permitted to be by defendant Peal a second time (Count 9). Plaintiff complained about both batteries in grievance McP-04-1388 to all Defendants to no avail. Plaintiff verbalized these complaints of battery (Counts 8 and 9) to Defendants Bardell and RNP Johnson on or about October 26, 2004, and her intent to file instant complaint yet Defendants Bardell and Johnson continued to refuse to refer Plaintiff to any other Surgeon for proper, Professional, competent, constitutionally adequate medical care.

107.    At the time of the commission of the tort of battery (Counts 8 and 9), Defendant Peal was acting within the scope of his employment/contract for services with Defendants ADC and CMS. Therefore, under the doctrine of *respondeat superior,* Defendants ADC, CMS, Norris May, Dr. Mobley, Byus, Dr. Anderson, Dr. Scott, Dr. Bardell, RNP Johnson, Bradshaw, Maple, Dixon, Gibson, and other John and Jane Does are responsible for Defendant Peal's conduct as well.

## COUNT 10: ASSAULT
(See grievance McP-04-1473)

108. Plaintiff incorporates by reference paragraphs 1 through 107.

109. Defendants Bardell and Alcorn committed the tort of assault upon Plaintiff by attempting or threatening to inflict injury on Plaintiff while processing a present ability to do so, and intentionally displaying force so as to give Plaintiff a reason to fear or expect immediate bodily injury. This assault was committed under the order of Defendant Bardell by Defendant Alcorn by using a needle to draw a tube of blood under the threat of disciplinary action and under the color of law vested to Alcorn by her position. At the time the assault occurred, Plaintiff was unaware of the reason Defendants wanted the blood, but bodily injury was inflicted by invasively drawing a tube of Plaintiff's blood without Plaintiff's informed consent constituting an unreasonable and illegal search and seizure of Plaintiff's blood as well. This assault caused grievous and severe physical and psychological damage to Plaintiff, from which he has suffered since the incident and from which he will continue to suffer in the future.

110. Defendants ADC, CMS, Dr. Anderson, Dr. Bardell, Tom Bradshaw, Dr. Mobley, Byus, Maple, Dixon, RNP Johnson, Norris, May, Gibson, U.S. Department of Justice, and other John and Jane Does Negligently caused the assault by failure to properly train, supervise and control of Defendants Bardell and Alcorn.

111. At the time of the commission of the tort of assault, Defendants Bardell and Alcorn were acting within the cope of their employment. Therefore, under the doctrine of *respondeat superior* Defendants ADC, CMS, Dr. Anderson, Dr. Bardell, Bradshaw, RNP

Johnson, Dr. Mobley, Byus, Maple, Dixon, Norris, May, Gibson, and other John and Jane Does are responsible for their conduct as well.

## COUNT 11: BATTERY
(See Grievance McP-04-1473)

112. Plaintiff incorporates by reference paragraphs 1 through 111.

113. Defendants Bardell and Alcorn committed the tort of battery upon Plaintiff by using a needle to remove Plaintiff's blood or recklessly using force upon her. This battery caused grievous and severe physical and psychological damage to Plaintiff, from which suffered since the incident and from which she will continue to suffer in the future.

114. Defendants ADC, CMS, Dr. Anderson, Dr. Bardell, Bradshaw, Dr. Mobley, Byus, Maple, Dixon, RNP Johnson, Norris, May, Gibson, and other John and Jane Does negligently caused the battery by failure to train, supervise, and control the conduct of Defendants Bardell and Alcorn.

115. At the time of the commission of the tort of battery, Defendants Bardell and Alcorn were acting within the scope of their employment. Therefore, under the doctrine of *respondent superior,* Defendants ADC, CMS, Dr. Anderson, Dr. Bardell, Bradshaw, Dr. Mobley, Byus, Maple, Dixon, RNP Johnson, Norris, May, Gibson, and other John and Jane Does are responsible for their conduct as well.

## COUNT 12: RETALIATION
(See grievances: McP-02-4570, McP-04-4571, McP-04-289-600, McP-04-398-600, McP-04-402-600, McP-04-536-600, McP-04-779-600, McP-04-1219, McP-04-1250, McP-04-1259, McP-04-1278, McP-04-01388-900, and others).

116. Plaintiff incorporates by reference paragraphs 1 through 115.

117. Defendants, Dixon, Maple, Roberts, Dr. Bardell, RNP Johnson, Gibson, Norris, Bradshaw, Dr. Mobley, May, Norris, ADC, CMS, and Dr. Anderson committed the tort of retaliation upon Plaintiff by retaliating against Plaintiff for verbal complaints, written complaints, refusal to fully cooperate during investigations, refusal to provide statements against officers upon Dixon's request for using the prison grievance system, for filing a grievance with the Arkansas Medical Board against Defendant Bardell and for beating a disciplinary written on Dixon's order.

118. During December of 2002, Defendant Dixon retaliated against Plaintiff for her beating a retaliatory disciplinary (11/02). By placing Plaintiff in an "open barracks" full of wool blankets in violation of her medical restrictions, so that Plaintiff would have a severe allergic reaction, scarring and other negative side effects. From the moment, Plaintiff met Defendant Bardell on or about January 15, 2004, Plaintiff began complaining about the inadequate medical care being provided by Defendant Bardell. Plaintiff filed a number of prison grievances and a formal complaint to the Arkansas Medical Board regarding the inadequate care being provided to Plaintiff. As a result, Defendant Bardell become vindictive and began retaliating against Plaintiff by discontinuing Plaintiffs medical rest restrictions such as her "extra feminine pads" her embarrassment and humiliation and her "Closed Pod" and "non-wool environment" restriction to cause injury or death to Plaintiff to permit a retaliatory disciplinary to be written [which Plaintiff was found guilty of] and affirmed on appeal. Defendant Bardell ordered RNP Johnson to engage in certain acts, to deny Plaintiff Medical care, and other acts. Bardell continues to violate policy, procedure, and ADC/CMS contract by refusing to refer Plaintiff for a second surgery consult opinion and trying to force Plaintiff to return to see Dr. Peal who misdiagnosed and caused injury to plaintiff. Defendant Bardell continues to retaliate against

Plaintiff by providing in adequate medical care and false information to Defendants Mobley,
Maple, Gibson, May, and others to conceal Plaintiff's actual medical condition and the
inadequate care being provided.

119.    From the moment Plaintiff refused to provide certain information requested by
Defendant Dixon in June of 2004, Defendant Dixon engaged in numerous acts of retaliation
against Plaintiff.  First, Defendant Dixon concealed a letter signed by Plaintiff and Inmate Lucy
Smith proving that Plaintiff had the prior approval of Cpl. Roberts (craft supervisor) to purchase
bed dolls (chunky children's dolls) from C & J Country Craft.  Then, Dixon ordered Captain
Faust to write Plaintiff a retaliatory disciplinary dated June 22, 2004, Dixon hid this letter that
proved Plaintiff's actual innocence and Linda Dykes (Disciplinary hearing officer) found
Plaintiff guilty of the disciplinary (MDR#1).  Defendant Maple supported this retaliatory
disciplinary and affirmed the defective, expired disciplinary.  Plaintiff did not provide all of the
assistance requested by Defendant Gibson, so he retaliated against Plaintiff by affirming the
disciplinary.  Gibson did not respond within 5 days, so Plaintiff's attorney submitted her third
level appeal to Defendant Norris, Defendant Gibson intercepted the disciplinary (3rd level) and
held it until he affirmed Plaintiff's MDR #1.  Plaintiff was in Gibson's office the day he told
Plaintiff that he had modified her disciplinary and that he was going to hand carry Plaintiff's
third level appeal to Defendant Norris.  Defendant Norris supported this chain of retaliation and
retaliated himself by affirming Plaintiff's MDR #1.

120.    On July 29, 2004, Defendant Dixon went to Defendants Bardell, RNP Johnson,
and Bradshaw, and requested that Plaintiff's medical restrictions for "Closed Pod" and "non-
wool environment" be discontinued which they thought they did.  This was done in retaliation
for Plaintiff's filing, grievances and other reasons, and was done to cause injury and/or death to

Plaintiff. Defendant ordered that Plaintiff be moved from segregation to barracks #14, full of wall blankets, for which Plaintiff refused to do. Defendant Dixon ordered Plaintiff to be written a retaliatory disciplinary. On July 30, 2004, Plaintiff showed Lt. Loftis a copy of Plaintiff's valid medical restriction for "closed pod" and "non-wool environment" [MSF 201] whom showed it to Defendant Dixon. Dixon took it to Defendants Bardell and RNP Johnson to be discontinued, which it was. However, these careless fools did not realize that Plaintiff had a valid permanent Classification Medical Assignment form MSF 103 in her jacket that remained valid. Defendants Maple and Gibson affirmed the guilty verdict found against Plaintiff, which resulted in loss of class, loss of good time and punitive segregation for 15 days, as acts of retaliation. Defendant Norris denied Plaintiff's third level of appeal as an act of retaliation. Defendant Bradshaw provided false information on this matter and Plaintiff's medical care to Defendants Gibson, Maple, May, Norris, the DHO (MDR #2) and others in retaliation for her prison grievances regarding the inadequate medical care being received. Defendant Roberts provided false information during the course of an investigation (MDR #1) in retaliation for Plaintiff's suspected involvement in an incident that the retaliatory disciplinary (MDR#1) was written. Defendants Mobley, Anderson, and Byus retaliated by providing inadequate medical care in retaliation for Plaintiff's grievances.

121. From April 2005, to an unknown future date, Defendants Weaver, Dr. Bardell, Gibson, ADC, and other unknown Defendants conspired to make false statements against Plaintiff; to lock Plaintiff in Segregation under investigation; to limit her showers, TV, and other privileges; to infringe on her liberty interests to prevent Plaintiff's participation in the Work Release Program; to injury her economically; to exerbated Plaintiff's medical condition; and other acts of retaliation.

122.     Defendants ADC, CMS, Maple, Gibson, May Norris Mobley, Byus, Bradshaw, Bardell, Dr. Anderson, Georgia Weaver, and other John and Jane Does negligently caused, actually participated in, or turned a blind eye to the acts of retaliation by failure to properly train, supervise, and control the conduct of Defendants Maple, Gibson, May, CMS, Norris, Mobley, Byus, Bradshaw, RNP Johnson, Bardell, Anderson, and other John and Jane Does.

123.     At the time of the commission of the tort of retaliation, Defendants CMS, Maple, Gibson, Morris Mobley, Byus, Bradshaw, RNP Johnson, Bardell, Anderson, and other John and Jane Does were acting within the scope of their employment. Therefore, under the doctrine of *respondeat superior*, Defendants ADC, CMS, Norris, May, Maple, Bardell, Gibson, Byus, Mobley, Anderson, and other John and Jane Does are responsible for their conduct as well.

## COUNT 13: ILLEGAL SEARCH AND SEIZURE
(See Grievance McP-04-1473)

124.     Plaintiff incorporates by reference paragraphs 1 through 1 – 123

125.     On October 15, 2004, Defendants Dr. Bardell and Monica Alcorn committed the tort of illegal search and seizure upon Plaintiff by drawing an extra vial of her blood and running a pregnancy (Hcg) test against Plaintiff's explicit refused and her right to informed consent. Furthermore, Defendant Alcorn explicitly told Plaintiff that she was not drawing blood for a pregnancy test, and Plaintiff made it clear to Alcorn that she would not submit to a pregnancy test. Defendant Alcorn used fraud to by-pass Plaintiff's right to informed consent to obtain the blood sample without a court order. This violated Plaintiff's right not to be subjected to unreasonable, illegal searches and seizures. This illegal search and seizure was ordered by Defendant Bardell with the intent to obtain the sample without Plaintiff's Knowledge and informed consent. Defendants ADC, CMS, Maple, Dr. Bardell, Bradshaw, RNP Johnson,

Gibson, May, Norris, Mobley, Byus, and other John and Jane Does negligently caused, actually participated in, or turned a blind eye to this illegal search and seizure by failure to properly train, supervise, and control the conduct of Defendants Bardell and Alcorn.

126.    At the time of commission of the tort of illegal search and seizure, Defendants Bardell and Alcorn were acting with in the scope of their employment. Therefore, under the doctrine of *respondeat superior*, Defendants ADC, CMS, Dr. Bardell, Dr. J. Roland Anderson, Bradshaw, Dr. Mobley, Byus, Norris, May, Maple, Dixon, Gibson, and other John and Jane Does are responsible for their conduct as well.

## COUNT 14:  CONSPIRACY TO DEPRIVE PLAINTIFF OF CIVIL RIGHTS
(See grievance: McP-04-1250, et al.)

127.    Plaintiff incorporates by reference paragraphs 1 through 126.

128.    Defendants Dixon, Dr. Bardell, RNP Johnson, Maple, Alcorn, Gibson, May, Weaver, Bradshaw, Dr. Peal, Norris, CMS, ADC, Mobley, Byus Dr. J. Roland Anderson, and other John and Jane Does conspired to deprive Plaintiff of her constitutional rights, as set forth in Counts 1 through 13. The deprivations of constitutional rights and the injuries, which Plaintiff sustained, were the proximate result of this conspiracy.

## COUNT 15:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OR OUTRAGE

129.    Plaintiff incorporates by reference paragraphs 1 through 128.

130.    Defendants Dr. Bardell, Dr. J. Roland Anderson, Dr. Peal, RNP Johnson, Dr. Scott, Bradshaw, Dr. Mobley, Byus, Gibson, Alcorn, Dixon, Maple, and other John and Jane Does were intending to inflict emotional distress on Plaintiff, or the Defendants willfully and

wantonly knew or should have known that emotional distress was the likely result of their conduct. The conduct of Defendants Dr. Bardell, Dr. Peal, Dr. Scott, Dr. J. Roland Anderson, Bradshaw, RNP Johnson, Dr. Mobley, Byus, Gibson, Alcorn, Dixon, Maple, and other John and Jane Does was extreme and out rageous and beyond all possible bounds of decency, and was latterly intolerable in a civilized community. The actions of the Defendants were the cause of Plaintiff's distress. The emotional distress sustained by Plaintiff was so severe that no reasonable person could be expected to endure it.

131.    This outrage caused grievous and severe physical and psychological damage to Plaintiff, from which she has suffered since the incident and from which she will continue to suffer in the future.

132.    Defendants ADC, CMS, Norris, May, Dr. Mobley, Byus, Dr. J. Roland, Dr. Scott, Anderson, Bradshaw, Maple, Dixon, Gibson, Dr. Bardell, and other John and Jane Does negligently caused the tort of outrage by failure to properly train, supervise and control the conduct of Defendants RNP Johnson, Alcorn, Dr. Bardell, Dr. Scott, Dr. Anderson, Dr. Mobley, Byus, Dr. Peal, Bradshaw, Gibson, Dixon, Maple and other John and Jane Does.

133.    At the time of the commission of the tort of out rage Defendants Alcorn, RNP Johnson, Dr. Bardell, Dr. Anderson, Dr. Scott, Bradshaw, Dr. Scott, Dr. Mobley, Byus, Dr. Peal, Gibson, Dixon, Maple, and other John and Jane Does were acting within the scope of their employment. Therefore, *respondeat superior,* Defendants ADC, CMS, Norris, May, Dr. Mobley, Dr. Anderson, Bradshaw, Byus, Maple, Dixon, Dr. Bardell, Dr. Scott, and other John and Jane Does are responsible for their conduct as well.

## COUNT 16: VIOLATION OF RIGHT TO THE EXERCISE OF RELIGION
(See grievances: McP-04-1358-510)

144. Plaintiff's *Richmond* claims do not "called into question the lawfulness of Plaintiff's continuing confinement, and claims that Defendants used the wrong procedures. *Armento-Bey V. Harper, 68 F. 3d 315 (8th Cir. 1995).*

145. Plaintiff's *Richmond* statute of limitation and procedural due process claims stand regardless of the final disposition of the disciplinary decision. Defendants ADC's inmate grievance policy prohibits Plaintiff from grieving a disciplinary action, so she has exhausted her administrative remedies.

146. Defendants ADC, Maple Gibson, and Norris negligently caused the Statute of limitations and Procedural Due Process violations by failure to properly train, supervise and control the conduct of Defendant Dykes as well and turning a blind eye to the conduct.

147. At the time of the commission of the torts of statute of limitations and Procedural Due Process Violations, Defendant Dykes was acting within the scope of her employment with Defendant ADC. Therefore, under the doctrine of *respondeat superior,* Defendants ADC, Norris Gibson, and Maple are responsible for Defendant Dykes' as well, but turned a blind to this conduct and failed to correct it.

## COUNT 18: WOLFF PROCEDURAL DUE PROCESS VIOLATIONS

148. Plaintiff incorporates by reference paragraphs 1 through 147.

149. Defendant Lt. John Doe committed the tort of *Wolff* Procedural Due Process Violations by knowingly and intentionally disregarding the Standards of AR831 and set by the U.S. Supreme Court in *Wolff v. McDonnell, 94 C. Ct. 2963 (1974), and* violating Plaintiff right to present evidence on her behalf by not reviewing and considering Plaintiff's medical records and accepting a false statement by Defendant Bradshaw as truthful. Defendant Bradshaw

knowing and intentionally provided a false statement regarding the contents of Plaintiff's medical records to deny Plaintiff's right to present evidence on her behalf in violation of *Wolff*. Defendant Lt. John Doe relied on this *Wolff* procedural due process violation and found Plaintiff guilty of the MDR, which resulted in Plaintiff being reduced to a Class IV, Punitive Segregation for 15 days, loss of 60 days good time, other sanctions, and further loss of her guaranteed parole date. Defendant Lt. John Doe knowingly and intentionally violated Plaintiff 's *Wolff* procedural due process rights causing grievous economic, physical, and psychological damage to Plaintiff, from which she has suffered since the incident and from which she will continue to suffer in the future, including but not limited to: Plaintiff's ability to participate in the Wrightsville Work-Release program, to receive its economic interests, to receive the liberty interests associated with its furlough, and a delay in her future release on parole. Defendants Maple, Gibson, Norris, and ADC did not apply AR831 and *Richmond* during the appeal process of this MDR thereby committing the tort of *Wolff* Procedural Due Process Violations.

150.   Plaintiff's *Wolff* Procedural Due Process claims do not require the disciplinary decision to be invalidated as her procedural due process rights were clearly established in *Wolff* and intentionally violated by Defendants Lt. John Doe, Bradshaw, ADC, Maple, Gibson, and Norris.

151.   Plaintiff expressly states that she seeks relief in the form of monetary damages only, and not restoration of goodtime, class etc. which can be challenged by other means if Plaintiff should so choose.

152.   Plaintiff *Wolff* claims do not "call into question the lawfulness of Plaintiff's continuing confinement", and claims that Defendants used the wrong, procedures, rather than for reaching the wrong results. *Armento-Bey v Harper,* 68 F 3d 215 (8th Cir. 1995).

153.   Plaintiff's *Wolff* procedural due process claims stand regardless of the final disposition of the disciplinary decision. Defendant ADC's inmate grievance policy prohibits Plaintiff from grieving a disciplinary action, so she has exhausted her administrative remedies.

154.   Defendants ADC, Maple, Gibson, Norris, Anderson, and CMS negligently caused the *Wolff* procedural due process violations by failure to properly train, supervise, and control the conduct of Defendants Lt. John Doe, Bradshaw, Maple, Gibson, and Norris.

155.   At the time of the commission of the tort of *Wolff* procedural due process violations, Defendant Lt. John Doe was acting within the scope of his employment with Defendant ADC. Therefore, under the doctrine of *respondeat Superior*, Defendants ADC, Norris, Gibson, and Maple are responsible for Defendant Lt. John Doe's conduct as well and by turning a blind eye to the conduct.

156.   At the time of the commission of the tort of *Wolff* procedural due process violations, Defendant Bradshaw was acting within the scope of his employment with Defendant CMS under contract with Defendant ADC. Therefore under the doctrine of *respondaet Superior*, Defendants CMS, Anderson, ADC, Norris, Gibson, and Maple are responsible for Defendant Bradshaw's conduct as well and by turning a blind eye to the conduct.

## COUNT 19:  *WOLFF* PROCEDURAL DUE PROCESS VIOLATIONS

157.   Plaintiff incorporates by reference paragraphs 1-156.

158.   Defendant Cargill committed the tort of Procedural Due Process Violations by knowingly and intentionally disregarding the standards of AR 831 and by the U.S. Supreme Court in Wolff v McDonnell, 94 S. Ct. 2963 (1974), and finding Plaintiff guilty of a disciplinary charge which she did not receive any written notice of, much less the minimum (24) hour

requirement. Plaintiff provided copy of *Wolff* to Defendant Cargill, who thumbed his nose to the controlling authority of the U.S. Supreme to establish case law by which he must abide, and Defendant Cargill knowingly and intentionally violated Plaintiff's *Wolff* Procedural Due Process rights established in *Wolff,* causing grievous economic, physical, and psychological damage to Plaintiff, from which she has suffered since the incident and from which she will continue to suffer in the future, including but not limited to: Plaintiff's ability to participate in the Wrightsville Work-Release Program, to receive its economic interests, to receive the liberty interests associated with its furloughs and a delay in her future release on parole.

If Defendants ADC, Maple, Gibson, and Norris do not apply *Wolff* in the appeal process of this MDR, it is in retaliation for filing grievances and seeking redress in the courts and violates Plaintiff's Procedural due process rights.

159.    Plaintiff's Procedural Due Process claims do not require the disciplinary decision to be invalidated as her procedural due process rights ere clearly established in *Wolff* and intentionally violated by Defendant Cargill and possibly Defendants ADC, Maple, Gibson, and Norris (to be determined). Plaintiff expressly states that she seeks relief in the form of money damages only, and not restoration of goodtime, class, etc. which can be challenged by other means if Plaintiff should so choose.

160.    Plaintiff *Wolff* claims do not "call into question the lawfulness of Plaintiff's continuing confinement", and claims that Defendants(s) used the wrong procedures, rather than for reaching the wrong result. *Armento-Bey v Harper,* 68 F. 3d 215 (8th Cir – 1995). Plaintiff's *Wolff* procedural due process claims stand regardless of the final disposition OF THE DISCIPLINARY DECISION. Defendant ADC's inmate grievance policy prohibits Plaintiff from grieving a disciplinary action, so she has exhausted her administrative remedies.

161.    Defendants ADC, Maple Gibson, and Norris negligently caused the procedural Due Process violations by failure to properly train, supervise, and control the conduct of Defendants Maple, Gibson, Norris, and Cargill.

162.    At the time of the commission of the tort of Procedural Due Process Violations, Defendant Cargill was acting within the scope of his employment with Defendant ADC. Therefore, under the doctrine of *respondeat Superior*, Defendants ADC, Norris, Gibson, and Maple are responsible for Defendant Cargill's conduct as well.

## RELIEF REQUESTED:

WHEREFORE, Plaintiff requests the following relief:

(A)     Judgment against all Defendants on all corresponding counts jointly and severally for compensatory damages to be determined by the trier of the fact;

(B)     Punitive damages for Defendants' willful, and outrageous misconduct in an amount to be determined by the trier of the fact;

(C)     Actual, compensatory, and punitive damages;

(D)     The costs of her suit and attorneys' fees and such other and further relief as this court may deem proper;

(E)     Defendants are sued in their individual and professional capacities; and

(F)     A jury trial on all counts.

I declare under the penalty of perjury that the foregoing is true and correct. EXECUTED on this _____ 7th _____ day of March, 2007.

Respectfully submitted,

Vera Arnold, Plaintiff pro se
ADC# 706169
302 Wackenhut Way
Newport, AR 72112

GRIEVANCE FORM - (Attachment 1A)    RECEIVED

UNIT/CENTER _McPherson_    SEP 2 0 2004

McPherson Unit Grievance

**FOR OFFICE USE ONLY**
Grv. # _MCP-04-01388_
Date Received _9-20-04_
Grievance Code: _____ 900

PLEASE PRINT Name _Vera Apple_    ADC# _706169_  Brks _14_  Job Assignment _Bldg Utility_

IS THIS GRIEVANCE A MEDICAL GRIEVANCE?  Yes _✓_  No _____

**All complaints/concerns should first be handled informally before proceeding to the formal grievance procedure.**

**THE ORIGINAL INFORMAL RESOLUTION FORM SHALL BE ATTACHED**

**Informal Action Taken**

Have you discussed this problem with your designated problem-solver? Yes ___ No _✓_ If yes, give date _N/A_

Why do you feel the informal resolution was unsuccessful? _NA - This involves PHYSICAL ABUSE BY MEDICAL-CMS- Dr. Bariell, et al._

Please give a **BRIEF**, clear statement of your grievance. This statement must be specific as to the complaint, **dates**, places, personnel involved, how **you** were affected and what you want to resolve the issue. **One issue** or incident per grievance. Additional pages or forms will **not** be allowed and if attached, will result in the automatic rejection of this grievance without content review. _I need a biopsy and bloodwork (CBC-etc. check for leukocytosis). I have severe night sweats, sweating, etc. I believe Metastasis b is occurring on Thursday, 9-11-04, Newport Hospital Radiology Dept (unknown Tech + Dr.) did a second ultrasound of a large lump/tumor in my Right axilla. The Radiologist found a huge, reactive lymph node. He said it was ☐☐☐ kidney shaped with measurements of 3½ cm x 5 cm. I heard correctly. He said it med definitely was not a lipoma. He further stated that it should be cancerous until proven otherwise. He went to low ft. in my MRI film for a re-reading. He was saying that AHC/CMS did not do any bloodwork (CBC), or a biopsy after several doctors ordered it. This is physical abuse by Dr. Bardill, AHC, CMS, RNP Johnson, Tom Bradshaw, Dr. J. Roland Anderson, Dr. Gabriel Heal, Dr. Max Mobley, John Byus, Larry Noy, Larry Norris, Larry May, Warden Maple, Major Burn, and others Jim Gibson, + other unknown persons. They are being deliberately indifferent to my medical care._

IS THIS AN EMERGENCY SITUATION? YES _✓_ NO ___  If yes, why? _Because my physical health is at stake on Neplety give a dam. If action is not taken, I will suffer death or irreparable harm_

(An emergency situation is one in which you may be subject to a substantial risk of physical harm. It should not be declared for ordinary problems that are not of a serious nature.) If you marked yes, you may give this completed form to any officer or department employee who shall sign the attached emergency receipt, give you the receipt and deliver it without undue delay to the ARO, the Warden/Center Supervisor or, in their absence, to the Unit/Center Assistant Warden. REPRISALS: If you are harmed or threatened because of your use of the grievance form, report it immediately to the Warden.

**INMATE SIGNATURE** _[signature]_    **DATE** _9-20-04_

(TO BE FILLED OUT BY THE RECEIVING OFFICER)

**RECEIPT FOR EMERGENCY SITUATIONS**

OFFICER (Please Print) _Peggy Benish_  Signature _[signature]_

FROM WHICH INMATE? _Vera Apple_    ADC# _706169_

MC

INMATE NAME: Vera Arnold      ADC#7¹⁶¹⁶⁹      GRIEVANCE# McP-04-01388

## WARDEN'S/CENTER SUPERVISOR'S DECISION

Inmate Arnold,

I received your grievance on 9/20/04.

A review of your grievance finds that your issue is with Medical and you wanting a biopsy and blood work concerning a lump under your right arm. You claim that medical is being indifferent to your medical care.
According to Mr. Bradshaw, CMS Administrator, you are receiving appropriate care and your medical needs are being met.

As for your filing of this Grievance as a complaint of physical abuse, your complaint does not fall under this category. You have not followed procedure under AD04-01. Your issue is a medical issue. A physical abuse issue would be defined as an assault by staff. Your complaint does not meet this criteria. The memo from Mr. Norris, stating that inmates may file a grievance directly to the Warden without going through the Informal Resolution Process does not apply to your complaint. You will need to address future complaints regarding medical issues as outlined in AD-04-01 Inmate Grievance Procedures.

Your grievance is without merit .

If you do not agree with my response, you may appeal my decision in five (5) days to Mr. Larry May, Assistant/Deputy Director, Central Office, Pine Bluff.

| Signature of ARO or Warden's/Supervisor's Designee | Warden | 9-22-04 |
|---|---|---|
| | Title | Date |

### INMATE'S APPEAL

If you are not satisfied with this response, you may appeal this decision within five days by filling in the information requested below and mailing it to the appropriate Deputy/Assistant Director. Keep in mind that you are appealing the decision to the original complaint. Do not list additional issues, which are not a part of your complaint.

WHY DO YOU NOT AGREE WITH THE RESPONSE?

Because it was ruled left weak by a radiologist that I have since until proven otherwise in the lump/lymph node in my Right Arm until Medical Center staff. This has gone on for almost 8 months without proper diagnosis and without treatment. When it has been identified as a lymph node lipoma as CMS, ADC, Dr. Ivil and Nurse by Dr. Gabriel Perez had diagnosed no with. Because of location and my current symptoms it is not only cancerous but I've likely metastasized. This kind metastic may have given me a death sentence when it could have been treated effectively early on. ⑦

| Inmate Signature | 700169 | 9-23-04 |
|---|---|---|
| | ADC# | Date |

13.34

After I filed this grievance, I was suddenly taken to see Dr. Peal who misdiagnosed me in May despite Dr. Scott's [DO?] Dx of involving lymphatics / lymph nodes. Dr. J. Roland Anderson misdiagnosed me, too, as did other unknown persons. The unknown radiologist who read the MRI blatantly missed the enlarged lymph node. I had a second radiologist review the MRI films (actually my boyfriend Dr. John Daugherty did) at my request) who found it. Since May (4½ months), the size has increased (lump). In May, Dr. Peal pinched the lump very hard and told me it was fat. It was very painful - like picking a dog up by the skin on the back of its neck. This may have caused the size to increase and any cancer to spread. Now, I saw Dr. Peal on Wed (9/22/04). Dr. Peal pinched it again and called it a fat pouch. I told him that that the radiologist last week (9/16/04) told me that it is a "reactive," enlarged kidney shaped lymph node that is approximately 3½ cm x 5 cm in size. He told me how big that is + that he could not possibly miss something that big. He said that is not there despite my showing him exactly where the bulge from it is. — He went to look in my file for the US report. He found it and read part of it out loud, + scratched his head. He came back and found it exactly where I told him it was. It took him a few minutes to find it despite it being very obvious. He acted like it is not a big deal. His nonchalant attitude towards a lymph node this size is unacceptable. He missed it in May + would have on this visit ē the exception of my insistence. If this is cancerous, I am going to sue all parties listed on my formal grievance for being indifferent to my medical care. Failure to take care in January or February of this problem has endangered my health and life. I may die because of this. I want referred to UAMS for a PET scan, bloodwork, and surgery consult. I will not let Dr. Peal cut on me

INMATE NAME  Arnold, Vera  ADC  706169  GRIEVANCE  McP04-1388

## DEPUTY/ASSISTANT DIRECTOR'S DECISION

Your lengthy appeal basically states that you are not receiving proper medical treatment for the "lump" under your right arm. You state that you refuse to accept the diagnosis or treatment which has been recommended by Dr. Peal

The medical staff advises that a friend, of a friend, of yours, has interpreted your latest Ultra Sound film and he/she states that this lump is a lymph node. This information appears to be third handed and has not been substantiated by the unit provider. Your most recent visit to the surgeon indicates that this may be a lymph node and he wanted to remove it, saying that the trauma from a biopsy would be as intrusive as complete excision. At his recommendation you were sent for a follow-up mammogram during the first week of October and the result was normal. Mr. Bradshaw states that you are scheduled a follow up appointment with Dr. Peal on 10/13/04 for re-evaluation with the mammogram results and consideration for surgery.

I concur with the response from Warden Maples and this appeal currently has no merit.

_____   10-19-04
SIGNATURE                         DATE

Please be advised that if you appeal this decision to the U. S. District Court a copy of this Deputy/Assistant Director must be attached to any petition or complaint or the Court must dismiss your case without notice. You shall also be subject to paying filing fees pursuant to the Prison Litigation Act of 1995.

Vere Aenow # 106169
ADC BKS#14
302 Wackenhut Way
Newport, AR 72112          1 of 3
9-23-04

Dr. Max Mobley
P.O. Box 8707
Pine Bluff, AR 71611-8707

RECEIVED
OFFICE OF THE
DEPUTY DIRECTOR

SEP 28 2004

HEALTH & CORRECTIONAL PROGS.
AR DEPT. OF CORRECTION

Dr. Mobley:

In February, I talked to you in the law library
and showed you this large lump in my ® axilla.
you promised me medical care. For approximately
8 months, I have been shuffled around and
misdiagnosed by Dr. J. Roland Anderson, Dr. Peal,
and the MRI radiologist. They have called it a
"lipoma." They were wrong!

The MRI conclusively shows an enlarged lymph
node. I had a second radiologist look at it,
so I pushed the issue.

On Thursday, 9-16-04, I had a second US done
@ Newport Hospital. The radiologist found an
enlarged, "reactive" ~~green~~ kidney-shaped lymph
node that is approximately 3½ cm x 5cm.

He told me to consider it cancerous until
proven otherwise. He further told me that if I
don't receive immediate care that I am going
to die! He said that by the size it has already

Ⓒ

metastacized.

On Wednesday, 9-22-04, I saw Dr. Peal. He is an idiot. He could not find the lymph node and refused to believe that it was there until he saw the report. Then, he found it.

Dr. Peal misdiagnosed me in May. He almost did it again yesterday except for my insistence.

I will not let Dr. Peal cut on me, because if he can't find an enlarged lymph node when it is bulging out, I will not let him ~~to go do around~~ try his talents within my body.

I am going to file a lawsuit against Dr. Peal and others. I ~~will~~ do not trust his medical judgment regarding my medical care. He will try to cover for his prior malpractice. I will not be butchered by him.

I ~~discussed~~ discussed ~~it~~ my medical care with my boyfriend and I want to be referred to UNM for a PET scan, blood work, surgery consult, etc.

At this point in time, PHC + CMS should be concerned with providing me with the best medical care that is available thru doctors

(3)

that is at UAMS. If not, I am going to die at 33 years old at the hands of butchers. I need to be seen at UAMS.

Please help me!

Sincerely,

# ACKNOWLEDGMENT OF GRIEVANCE

**TO:**   Inmate <u>Arnold, Vera</u>   ADC# <u>706169</u>   Unit <u>McPherson</u>

**FROM:**   <u>Max J. Mobley, Deputy Director</u>

**RE:**   Receipt of Grievance <u>McP04-1388</u>

**DATE:**   <u>9/30/04</u>

Please be advised, the appeal of your grievance dated <u>9/20/04</u>
was received in my office on this date <u>9/28/04</u>

You will receive a response from this office by         <u>11/8/04</u>

### OR

☐   This grievance is being returned to you because the time allowed for appeal has expired

☐   This grievance is being returned to you because you have not attached
    ☐ the informal resolution (Attachment 1)
    ☐ the original grievance
    ☐ the Warden's/Center Supervisor's Decision (Attachment 2)
    ☐ the Infirmary Response
    ☐ a clear statement of appeal (Back of Attachment 2)
Return your grievance with the checked items if you wish to continue the appeal process.

# ACKNOWLEDGMENT OF GRIEVANCE

TO:          Inmate Arnold, Vera    ADC# 706169     Unit McPherson

FROM:     Max J. Mobley, Deputy Director

RE:          Receipt of Grievance  McP04-1388

DATE:      9/30/04

Please be advised, the appeal of your grievance dated 9/20/04
          was received in my office on this date 9/28/04

You will receive a response from this office by        11/8/04

## OR

☐   This grievance is being returned to you because the time allowed for appeal has expired

☐   This grievance is being returned to you because you have not attached .
          ☐ the informal resolution (Attachment 1)
          ☐ the original grievance
          ☐ the Warden's/Center Supervisor's Decision (Attachment 2)
          ☐ the Infirmary Response
          ☐ a clear statement of appeal (Back of Attachment 2)
     Return your grievance with the checked items if you wish to continue the appeal process.

05-00037-600

**INFORMAL RESOLUTION FORM (Attachment 1)**

Date Received to medical on 1/10/05

JAN 10 2005 medical

UNIT/CENTER _McPherson_

**PLEASE PRINT**
Name _Vera Arixa_

ADC# _706169_ Brks _14_ Job Assignment _Bldg Utility_

IS THIS AN EMERGENCY SITUATION? YES ___ NO ___ If yes, why? _____

(An emergency situation is one in which you may be subject to a substantial risk or physical harm. It should not be declared for ordinary problems that are not of a serious nature.) If you marked yes, you may give this completed form to the designated problem-solving staff, who will sign the attached emergency receipt. You will be given a copy of this receipt by the designated problem-solving staff. REPRISALS: If you are harmed or threatened because of your use of the grievance form, report it immediately to the Warden.

Give a **BRIEF** statement of your complaint/concern. This statement must be specific as to the complaint, **dates**, places, personnel involved and how **you** were affected. **One issue** or incident per complaint form. Additional pages or forms will **not** be allowed.

I have requested adequate medical care regarding the swollen lymph nodes in my right axilla (axilla) breast (R) again, to no avail. Now, the lymph nodes are also swollen in my (L) breast and entire chest area. This is getting quite painful. I have made it clear to medical that I am willing to see the specialist(s) of their choice to no avail. I believe that my filing a lawsuit (4:05CV00023JLH/JWC) is being met with further retaliation. Dr Bardell, Dr. Anderson, Tim Bradshaw, RN Johnson, CMS, ANC, Dr. Mobley, John Byus, Warden Maple, Major Dixon, and other John Tom Does are intentionally providing inadequate medical care to inflict injury and/or death upon me and are responsible for the inadequate medical care and the increasing pain that I am suffering. I want my 4-Foss lab results.

_Vera_ signature
Inmate Signature

1-10-05
Date

**THIS SECTION TO BE FILLED OUT BY STAFF ONLY.**

**STAFF RECEIPT AND ACTION TAKEN**
Jonna Loftis

PRINT STAFF NAME (PROBLEM SOLVER)

Jonna Loftis  1-10-05
Staff Signature / Date Received

Was this deemed an emergency? Yes ___ No ___

Was there a need to contact medical? Yes ___ No ___  If yes, give name of person contacted? Mrs Morris

Describe action taken to resolve complaint, including dates. There is no medical indication that you have not received adequate medical care. You have been evaluated and told that you medical condition is benign.

1-11-05 JLM

Was issue resolved? Yes X  No ___  Does inmate agree that issue was resolved? Yes ___ No ✓

Above CPL C Chapman
Staff Signature/Date  1-14-05

_signature_ 1-14-05M
Inmate Signature/Date

DISTRIBUTION: YELLOW ~ Inmate Receipt

(AFTER COMPLETION)   PINK – Problem Solver Copy   BLUE – Grievance Officer

ORIGINAL – Given back to the Inmate After Completion

810-00

**GRIEVANCE FORM - (Attachment 1A)**

RECEIVED

JAN 1 4 2005

McPherson Unit Grievance

**FOR OFFICE USE ONLY**

Grv. # _MCP-05-00039_

Date Received _1-14-05_

Grievance Code: _600_

UNIT/CENTER _McPherson_

PLEASE PRINT
Name _Vera Arnold_  ADC# _706169_ Brks _14_ Job Assignment _Bldg Utility_

IS THIS GRIEVANCE A MEDICAL GRIEVANCE? Yes _✓_ No _____

All complaints/concerns should first be handled informally before proceeding to the formal grievance procedure.

**THE ORIGINAL INFORMAL RESOLUTION FORM SHALL BE ATTACHED**

**Informal Action Taken**

Have you discussed this problem with your designated problem-solver? Yes _✓_ No ___ If yes, give date _1-10-05_

Why do you feel the informal resolution was unsuccessful? _Because I have not received a_
_response in 3 days, and I am still without Medical care._

Please give a **BRIEF**, clear statement of your grievance. This statement must be specific as to the complaint, **dates**, places, personnel involved, how **you** were affected and what you want to resolve the issue. **One issue** or incident per grievance. Additional pages or forms will **not** be allowed and if attached, will result in the automatic rejection of this grievance without content review.

_I have an enlarged lymph node in my R axilla that is painful. I also have_
_enlarged lymph nodes in my L axilla, C breast, b/l breasts, chest, and R groin. I_
_am having pain in all of these various areas and my abdomen. Three doctors have_
_called the R axilla lump an "enlarged lymph node", and recommended a biopsy._
_Dr. Scott (NEW), Dr. Peal (SW Hospital) and Dr. Chauhan (radiologist-Newport). Despite_
_these findings, Dr. Bartlett, CMS, Dr. Anderson, Tom Bradshaw, and Dr. Mobley, John_
_Byus, ADC, and others John and Jane Does are refusing to provide me c the biopsy_
_as ordered. They are claiming it to be a "lipoma" and refusing to provide adequate media_
_care. I am not refusing medical care and will gladly go to the appropriate special is_
_of your choice in compliance with Ark Medical Board Regulations. Larry Norris, Larry May,_
_Max Mobley, Warden Maple, Major Dixon, the U.S. DOJ, James Gibson + Other John Jane Does are letting_
_this occur. It is in retaliation for filing a_

IS THIS AN EMERGENCY SITUATION? YES ___ NO _✓_ If yes, why? _lawsuit._

(An emergency situation is one in which you may be subject to a substantial risk or physical harm. It should be not be declared for ordinary problems that are not of a serious nature.) If you marked yes, you may give this completed form to any officer or department employee who shall sign the attached emergency receipt, give you the receipt and deliver it without undue delay to the ARO, the Warden/Center Supervisor or, in their absence, to the Unit/Center Assistant Warden. REPRISALS: If you are harmed or threatened because of your use of the grievance form, report it immediately to the Warden.

_[signature]_  **INMATE SIGNATURE**   DATE _1/13/05_

(TO BE FILLED OUT BY THE RECEIVING OFFICER)

**RECEIPT FOR EMERGENCY SITUATIONS**

OFFICER (Please Print) _____  Signature _____

FROM WHICH INMATE? _____  ADC# _____

# CMS GRIEVANCE RESPONSE

GRIEVANCE#: MCP05-00039

| INMATE: Arnold, Vera A. | ADC#: 706169 | DOB: 12/12/1970 |
|---|---|---|
| Facility: McPherson Unit [P02] | | Barracks: BK14 |
| Grv. Date: 01/14/2005 | Date Infirmary Recd: 01/19/2005 | Response Date: 02/01/2005 |

Interview:   Required  C    Deferred  ⦿

**Inmate's Complaints: (Code:)**
Medical (601) Inmate claims that she has an enlarged lymph node that she is not receiving treatment for. She also claims that she didn't receive a response from medical regarding her informal complaint.

**Responses:**
A review of your medical record and consultation with the Medical Director reveal that you have received prompt and careful attention to all your medical complaints. Qualified medical opinion indicates that you have a benign condition. Your opinion that you have another condition does not disqualify expert medical opinion nor qualify your medical care as inadequate. You have been educated and told that your condition is benign. There is NO MERIT to this grievance.

**Recommendations:**
N/A

| | |
|---|---|
| *Amy Morris* | 02/01/2005 |
| Responding Staff | Date |

**Follow Up Required?:**   Yes  C    No  ⦿



RECEIVED
OFFICE OF THE
INVESTIGATOR
FEB 10 2005
HEALTH & CORRECTIONAL PROGS
AR DEPT. OF CORRECTION

INMATE NAME: Arnold, Vera A.    ADC #: 706169A   GRIEVANCE #: MCP05-00039

## WARDEN'S/CENTER SUPERVISOR'S DECISION

I've determined that your grievance is a medical matter. I have forwarded your grievance to the
Medical Administrator who will provide a written response, and/or will interview you within
twenty working days of the date I received your grievance.
Should you receive no response within this time frame, or the response that you received is
unsatisfactory, you may appeal to the Deputy Director for Health and Correctional programs.
If you have medical needs that are urgent, put in a Sick Call Request, or send a Request for an
interview to the Medical Administrator.

_____        _____        _____
Signature of ARO or Warden's/Supervisor's    Title        Date
               Designee

_____

## INMATE'S APPEAL

If you are not satisfied with this response, you may appeal this decision within five days by
filling in the information requested below and mailing it to the appropriate Deputy/Assistant
Director. Keep in mind that you are appealing the decision to the original complaint. Do not list
additional issues which are not part of your complaint.

### WHY DO YOU NOT AGREE WITH THE RESPONSE?

I have enlarged (painful) lymph nodes all over my body. I have 3 massive lymph nodes:
(R) axilla, (L) axilla, and (R) groin. My lymph nodes in my chest, breast, and back continue to
swell and cause extreme pain and discomfort. I have agreed to go to their specialist(s) of
choice. However, Dr. Bardell continues to misdiagnose me with a benign lipoma. However,
Dr. Bardell has never personally examined me or seen the lymph nodes. He has no
first hand knowledge. Currently, I am suing Dr. Bardell, Dr. Gabriel Deal, ADC, CMS,
and others 4:05cv00013 JLH/JWC, for inadequate medical care, assault, battery, etc. I
am not refusing medical care and will go to the specialists(s) of choice in compliance with
Ark. Medical Board Regulations regarding conflicts of interest, etc. I am being made to
suffer mentally and physically. ADC, CMS, Dr. Anderson, Tom Bradshaw, Dr. Mckbey, John Byus, Larry
Norris, Larry May, U.S. Department of Justice (DOJ), Warden Maple, Major Dixon, +others John Tara Does are responsible for
Dr. Bardell's act
and this inadequate
medical care.

_____        _____        _____
Inmate Signature       706169   ADC#       2/3/05   Date

RECEIVED
OFFICE OF THE
INVESTIGATOR

FEB 10 2005

HEALTH & CORRECTIONAL
AR DEPT. OF CORR...

# ACKNOWLEDGMENT OF GRIEVANCE

**TO:**      Inmate Arnold, Vera     ADC# 706169     Unit McPherson

**FROM:**    Max J. Mobley, Deputy Director

**RE:**      Receipt of Grievance  McP05/0039

**DATE:**   February 11, 2005

Please be advised, the appeal of your grievance dated 1/13/05
was received in my office on this date 2/10/05

You will receive a response from this office by       3/24/05

### OR

☐  This grievance is being returned to you because the time allowed for appeal has expired

☐  This grievance is being returned to you because you have not attached
      ☐ the informal resolution (Attachment 1)
      ☐ the original grievance
      ☐ the Warden's/Center Supervisor's Decision (Attachment 2)
      ☐ the Infirmary Response
      ☐ a clear statement of appeal (Back of Attachment 2)
Return your grievance with the checked items if you wish to continue the appeal process.

## GRIEVANCE FORM - (Attachment 1A)

**FOR OFFICE USE ONLY**

Grv. # _MCP-05-00348_

Date Received _5-5-05_

Grievance Code: _715_

UNIT/CENTER _Maximum_

**PLEASE PRINT**
Name _Varza Harrell_   ADC# _Judley_   Brks _H_   Job Assignment _Bldg Utility_

IS THIS GRIEVANCE A MEDICAL GRIEVANCE?   Yes _____   No _L_

**********************************************************************************

<u>All complaints/concerns should first be handled informally before proceeding to the formal grievance procedure.</u>

## THE ORIGINAL INFORMAL RESOLUTION FORM MUST BE ATTACHED

### Informal Action Taken

Have you discussed this problem with your designated problem-solver? Yes _L_ No __ If yes, give date _5/2/05_

Why do you feel the informal resolution was unsuccessful? _Because I am still in Seg based on a lie._

**********************************************************************************

Please give a **BRIEF**, clear statement of your grievance. This statement must be specific as to the complaint, **dates**, places, personnel involved, how **you** were affected and what you want to resolve the issue. **One issue** or incident per grievance. Additional pages or forms will **not** be allowed and if attached, will result in the automatic rejection of this grievance without content review.

_On 4-25-05, I was placed in Seg under the orders of IA James Gibson. On 4-27-05, I passed a polygraph regarding the false allegation made by IA Georgia Weaver. On 4-22-05, it is documented that it was proven that me a) any wrongdoing whatsoever, IA Bardell has pushed these false allegations into a State Police Investigation and has publically slandered me. He continues to spread these false allegations in Medical as does other medical staff. This is retaliation for me filing a federal lawsuit (4-05-CV-0013 JLH/HTR), ADC is violating AR 828 because of this_ _and others whereas in retaliation without an extension. Once an extension was issued, it expired on 5-02-05 at 12:15 pm. However, I remained in Seg until 5-4-05 at approx 8:30am when I received a new extension without a proper extension. Following ADC in violating AR828, section 3(b) by placing me in Seg without showing "in" and that the inmate has the present ability + intent to cause what harm. This standard has not been met and I intend to add it to my current lawsuit or file a new lawsuit. Family Norris, Larry King, ADC, CMS, IA Bardell, Warden Maples, Larry Gibson, D. Bardell, Jumpenstein, Dr. J. Roland Anderson_ _etc._ IS THIS AN EMERGENCY SITUATION?   YES ___   NO _L_   If yes, why? _violating my due process liberty interest rights_

(An emergency situation is one in which you may be subject to a substantial risk of physical harm. It should not be declared for ordinary problems that are not of a serious nature. If you marked yes, you may give this completed form to any officer or department employee who shall sign the attached emergency receipt, give you the receipt and deliver it without undue delay to the ARO, the Warden/Center Supervisor or, in their absence, to the Unit/Center Assistant Warden. REPRISALS: If you are harmed or threatened because of your use of the grievance form, report it immediately to the Warden.

_5-3-05_

**INMATE SIGNATURE**                          RECEIVED   **DATE**

(TO BE FILLED OUT BY THE RECEIVING OFFICER)

**RECEIPT FOR EMERGENCY SITUATIONS** MAY 1 1 2005

OFFICER (Please Print) _____   Signature _____
INMATE GRIEVANCE SUPERVISOR
FROM WHICH INMATE? _____   ADC#

DATE: _____   TIME: _____   ADMINISTRATION BUILDING

## INFORMAL RESOLUTION FORM (Attachment 1)

UNIT/CENTER _____

**PLEASE PRINT**
Name _____ ADC# _____ Brks ____ Job Assignment _____

IS THIS AN EMERGENCY SITUATION?  YES ___  NO ___  If yes, why? _____
_____

(An emergency situation is one in which you may be subject to a substantial risk or physical harm. It should not be declared for ordinary problems that are not of a serious nature.) If you marked yes, you may give this completed form to the designated problem-solving staff, who will sign the attached emergency receipt. You will be given a copy of this receipt by the designated problem-solving staff.  REPRISALS: If you are harmed or threatened because of your use of the grievance form, report it immediately to the Warden.

Give a **BRIEF** statement of your complaint/concern. This statement must be specific as to the complaint, **dates**, places, personnel involved and how **you** were affected. **One issue** or incident per complaint form. Additional pages or forms will **not** be allowed

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____    _____
Inmate Signature                                         Date

## THIS SECTION TO BE FILLED OUT BY STAFF ONLY.

**STAFF RECEIPT AND ACTION TAKEN**

Sgt. Donacion                              Sgt. Donacion 4-28-05
PRINT STAFF NAME (PROBLEM SOLVER)        Staff Code    Staff Signature / Date Received

Was this deemed an emergency?  Yes _____  No ✓

Was there a need to contact medical?  Yes _____  No ✓  If yes, give name of person contacted? _____

Describe action taken to resolve complaint, including dates. You were served an
extension. You have also been informed
who is doing the investigation.

_____

Was issue resolved?  Yes ✓  No _____    Does inmate agree that issue was resolved?  Yes _____  No _____

Sgt. Donacion  5-2-05  RECEIVED
Staff Signature/Date                              Inmate Signature/Date

DISTRIBUTION:  YELLOW – Inmate Receipt          MAY 1 1 2005

(AFTER COMPLETION)  PINK – Problem Solver/Complaint Resolution Officer    INMATE GRIEVANCE SUPERVISOR

ORIGINAL – Given back to inmate upon completion    ADMINISTRATION BUILDING      810-00

INMATE NAME: Arnold, Vera A.    ADC #: 706169A   GRIEVANCE #: MCP05-00348

## WARDEN'S/CENTER SUPERVISOR'S DECISION

A review of this grievance has found that you are grieving multiple issues:
1) Other complaints against Staff
2) Retailation/Harassment-
3) Other Legal Matters
Therefore I am returning this grievance to you without a determination of merit.

_____   _Warden_   _5-6-05_
Signature of ARO or Warden's/Supervisor's    Title    Date
Designee

---

## INMATE'S APPEAL

If you are not satisfied with this response, you may appeal this decision within five days by filling in the information requested below and mailing it to the appropriate Deputy/Assistant Director. Keep in mind that you are appealing the decision to the original complaint. Do not list additional issues which are not part of your complaint.

WHY DO YOU NOT AGREE WITH THE RESPONSE?

I am currently being housed in seg "under investigation" based on false allegations by TM Georgia Weaver + Dr. Bardell in violation of AD 82-8 because there is no showing "...and that the inmate has present ability and intent to cause the harm." (Section 3(b)). Dr. Bardell pushed This in retaliation for my filing Federal lawsuit against him. (4:05cv00013 SEH/JTR, ADC, CMS, Dr. Bardell, Internal Affairs, James Gibson, Larry Norris, Larry May, Tom Bradshaw, Dr. J. Roland Anderson, Warden Maple, + other unknown persons are responsible for this violation of my liberty interest and due process rights. This is cruel + unusual punishment.

_____   _706169_   _5-6-05_
Inmate Signature    ADC#    Date

**RECEIVED**

MAY 1 1 2005
INMATE GRIEVANCE SUPERVISOR
ADMINISTRATION BUILDING

IGTT410    Page 1 of 1

Vera A. Arnold                    706169   Back of Attachment II   MCP-05-0348

INMATE NAME _____ ADC# _____ GRIEVANCE # _____

# DEPUTY/ASSISTANT DIRECTOR'S DECISION

I have reviewed your grievance dated 5/3/05 in which you state, " On 4/25/05, I was placed in Seg. under the orders of IA-James Gibson. On 4/27/05, I passed a polygraph regarding the false allegations made by I/M Georgia Weaver. On 4/22/05, Warden Capel & Major Dixon cleared me of any wrong doing. However, Dr. Bardell has pushed these false allegations into a State Police Investigation and has publically slandered me. He continues to spread these false allegations in medical as does other medical staff. This is retaliation or me filing a federal lawsuit (4:05CV00013 JUT/JTR). ADC is violating AD 82-8 because I was held over 48 hours initially without an extension. Once an extension was issued, it expired on 5/02/05 at 12:15 pm However, I remained in Seg until 5/4/05 at approx. 8:30 am when I received a new extension, without a proper extension. Furthermore, ADC is violation AD 828, section 3 (b) by placing me in Sgt. without showing and that the inmate has the present ability & intent to cause that harm. This standard has not been met & I intend to add it to my current lawsuit or to file a new lawsuit, Larry Norris, Larry May, ADC, CMS, Dr. Bardell, Warden Maple, James Gibson, Dr. Bardell, Tom Bradshaw, Dr. J. Roland Anderson, & others are violating my due process & liberty interest rights." I have also reviewed the Unit's response, your appeal to this office, a statement from staff and other related documents.

Based upon my review of all documentation obtained by this office. I find that this grievance was addressed appropriately at the Unit level and I concur with the Warden's response.

Appeal denied.

_____
SIGNATURE

7:13:05
DATE

Please be advised that if you appeal this decision to the U.S. District Court, a copy of this Deputy/Assistant Director's Decision must be attached to any petition or complaint or the Court must dismiss your case without notice. You shall also be subject to paying filing fees pursuant to the Prison Litigation Act of 1995.

## GRIEVANCE FORM - (Attachment 1A)

REC...

UNIT/CENTER _McPherson_

| FOR OFFICE USE ONLY |
| --- |
| Grv. # _11-05-00334_ |
| Date Received _4-28-05_ |
| Grievance Code: _211_ |

**PLEASE PRINT**
Name _Vera (Henry) McPherson_ ADC# _____ Brks _91_ Job Assignment _Bldg_____

IS THIS GRIEVANCE A MEDICAL GRIEVANCE? Yes _____ No _____

**************************************************************************

**All complaints/concerns should first be handled informally before proceeding to the formal grievance procedure.**

## THE ORIGINAL INFORMAL RESOLUTION FORM MUST BE ATTACHED

### Informal Action Taken

Have you discussed this problem with your designated problem-solver? Yes ✓ No ___ If yes, give date _4/26/05_

Why do you feel the informal resolution was unsuccessful? _Because I am still misplaced on a lie told_
_by Georgia Weaver. I have been cleared by polygraph on 4/27/05). Policy_
_AD82-8 only permits that I be held in Seg for 48 hours under investigation."_

**************************************************************************

Please give a **BRIEF**, clear statement of your grievance. This statement must be specific as to the complaint, **dates**, places, personnel involved, how **you** were affected and what you want to resolve the issue. **One issue** or incident per grievance. Additional pages or forms will **not** be allowed and if attached, will result in the automatic rejection of this grievance without content review.

On 4-25-05, I was placed in Seg regarding false allegations made by the Georgia Weaver. An investigation was completed on Friday by Major Dixon and Warden Capel and no evidence was found to support the allegations, except false statements made by the Georgia Weaver. - Now Ms. Weaver was moved to BK#7 and pushed it with Dr. Bardell. The Meadows and myself were placed in Seg. I believe that Dr. Bardell pushed the investigation after he wasn't satisfied with Security's findings. In the meantime, The Georgia Weaver continues to spread her false statements + hinder the investigation. She should be locked up for lying since I was cleared by polygraph today (4-27-05). Her doing lies should be realiside. The State Police concluded their investigation today, so Weaver should be locked up for lying to staff. I believe that Dr. Bardell and others (NOT Major Dixon) pushed this in retaliation for the failed lawsuit pending (Hoscraar3 TcH/TR) ALC/CnTS/TL Bardell, Tom Bradshaw, IA, and other unknown arises are responsible for this retaliation. I am going to stain a copy of this file since the case is closed

IS THIS AN EMERGENCY SITUATION? YES ___ NO ✓ If yes, why? ___ # CID-F-C 2445-05

Officer Misd Crimes

(An emergency situation is one in which you may be subject to a substantial risk of physical harm. It should not be declared for ordinary problems that are not of a serious nature.) If you marked yes, you may give this completed form to any officer or department employee who shall sign the attached emergency receipt, give you the receipt and deliver it without undue delay to the Warden/Center Supervisor or, in their absence, to the Unit/Center Assistant Warden. REPRISALS: If you are harmed or threatened because of your use of the grievance form, report it immediately to the Warden.

RECEIVED 4/27/05

MAY 11 2005

_____        _____
INMATE SIGNATURE                              DATE

(TO BE FILLED OUT BY THE RECEIVING OFFICER)        ~~INMATE GRIEVANCE SUPERVISOR~~

RECEIPT FOR EMERGENCY SITUATIONS ~~ADMINISTRATION BUILDING~~

OFFICER (Please Print) _____ Signature _____

FROM WHICH INMATE? _____ ADC# _____

DATE: _____ TIME: _____

[illegible] 05-00334

**INFORMAL RESOLUTION FORM (Attachment 1)**

UNIT/CENTER McPherson

PLEASE PRINT
Name [illegible] ADC# [illegible] Brks [illegible] Job Assignment [illegible]

IS THIS AN EMERGENCY SITUATION? YES ___ NO ___ If yes, why? [illegible]

[illegible]

(An emergency situation is one in which you may be subject to a substantial risk or physical harm. It should not be declared for ordinary problems that are not of a serious nature.) If you marked yes, you may give this completed form to the designated problem-solving staff, who will sign the attached emergency receipt. You will be given a copy of this receipt by the designated problem-solving staff. REPRISALS: If you are harmed or threatened because of your use of the grievance form, report it immediately to the Warden.

---

Give a **BRIEF** statement of your complaint/concern. This statement must be specific as to the complaint, **dates**, places, personnel involved and how **you** were affected. **One issue** or incident per complaint form. Additional pages or forms will **not** be allowed.

On 4-25-05, I was placed in [illegible] regarding false allegations made by I/M Georgia Weaver. An investigation was done on Friday and no evidence was found to support the allegations except false statements made by I/M G. Weaver. — Now after Weaver was moved to Brks# 1 and [illegible] I/M T. Meadows + myself were locked up. In the meantime, I/M Georgia Weaver continues to spread her false statements and hinder the investigation. She should be locked up too and her diary [illegible] confiscated. You cannot conduct [illegible]. I believe this [illegible] retaliation for the lawsuit filed against Major [illegible] 4:05cv00029 JLH/JTR.

[illegible]

Inmate Signature [illegible] Date 4-25-05

---

**THIS SECTION TO BE FILLED OUT BY STAFF ONLY.**

**STAFF RECEIPT AND ACTION TAKEN**

Sgt. Duncan ___ Sgt. Duncan 4-25-05

PRINT STAFF NAME (PROBLEM SOLVER) Staff Code Staff Signature / Date Received

Was this deemed an emergency? Yes ___ No ✓

Was there a need to contact medical? Yes ___ No ✓ If yes, give name of person contacted? ___

Describe action taken to resolve complaint, including dates. Per Major Dixon you were placed in Segregation under Investigation per Internal Affairs.

Was issue resolved? Yes ✓ No ___ Does inmate agree that issue was resolved? Yes ___ No ✓

Sgt. Duncan 4-26-05 ___ RECEIVED ___

Staff Signature/Date Inmate Signature/Date

MAY 11 2005

INMATE GRIEVANCE SUPERVISOR
ADMINISTRATION BUILDING

DISTRIBUTION: YELLOW – Inmate Receipt

(AFTER COMPLETION) PINK – Problem Solver Copy BLUE – Grievance Officer

ORIGINAL – Given back to the Inmate After Completion

810-00

INMATE NAME: Arnold, Vera A. ADC #: 706169A GRIEVANCE #: MCP05-00334

WARDEN'S/CENTER SUPERVISOR'S DECISION

A review of this grievance found that you are grieving multiple issues:
1) Complaints against inmates
2) Other complaints against staff
AD04-01, Inmate Grievance Procedures, states that inmates may not grieve multiple issues.
You were placed on investigative status at the request of internal affairs. At such time that the investigation is completed, you will be notified. An extension has been submitted for your investigation status.
Your grievance is without merit.

| | | |
|---|---|---|
| J Maples | Warden | 4-29-05 |
| Signature of ARO or Warden's/Supervisor's Designee | Title | Date |

RECEIVED

MAY 1 1 2005

INMATE GRIEVANCE SUPERVISOR
ADMINISTRATION BUILDING

received 5/12/05 [illegible]

**INMATE'S APPEAL**

If you are not satisfied with this response, you may appeal this decision within five days by filling in the information requested below and mailing it to the appropriate Deputy/Assistant Director. Keep in mind that you are appealing the decision to the original complaint. Do not list additional issues which are not part of your complaint.

WHY DO YOU NOT AGREE WITH THE RESPONSE?

My complaint is that I have been [illegible] at Dr. Bartell [illegible] based on false allegations by [illegible] (on 4/25/05). On 4/27/05 (Wed), I passed a State Police polygraph and no deception was found. [illegible] The extension [illegible] today, and no new extension has been served. The last one was served a day late. [illegible] released — ARC, [illegible], Dr. Bartell, Tom Broadaway, IA, [illegible], Larry May, Dr. T. Roland Anderson, [illegible], Tina Ryan, Warden Maples + others are responsible for violating my liberty interests and due process rights by placing me in seg based on an inmate's unsubstantiated lies and continuing to hold

| | | |
|---|---|---|
| [illegible signature] | [illegible] | 5-?-05 |
| Inmate Signature | ADC# | Date |

me here after passing a State Police Polygraph. AD [illegible] is being [illegible] [illegible] without [illegible] rights, it violates policy to place me in seg under investigation [illegible] under [illegible] inmates' word!

IGTT410 Page 1 of 1

Vera Arnold                706169              Back of Attachment MCR#05-00334

INMATE NAME _____ ADC# _____ GRIEVANCE # _____

## DEPUTY/ASSISTANT DIRECTOR'S DECISION

I have reviewed your grievance dated 4/27/05 in which you state, " On 4/25/05, I was placed in Seg. regarding false allegations made by I/M Georgia Weaver, an investigation was completed on Friday by Major Dixon and Warden Capel and no evidence was found to support the allegations except false statements made by I/M Georgia Weaver. Now, after Weaver was moved to Bks. 7 and pushed it with Dr. Bardell, I/M Meadows and myself were placed in Seg. I believe that Dr. Bardell pushed the investigation after he was not satisfied with security's finding. In the meantime, I/M George Weaver continues to spread her false statements& hinder the investigation. She should be locked up for lying since I was cleared by polygraph today, (4/27/05). Her diary log should be confiscated. The State Police concluded their investigation today, so Weaver should be locked up for lying to staff. I believe that Dr. Bardell and others (not Major Dixon) pushed this in retaliation for the Federal lawsuit pending (4:05CV00013 JLH/JTR). ADC, CMS, Dr. Bardell, Tom Bradshaw, IA, and other unknown persons are responsible of this retaliation. I am going to obtain a copy of the file since the case is closed #CID-F-02445-05 Officer Mike Grimes)." I have also reviewed the Unit's response, your appeal to this office and other related documents.

After my review of all documentation obtained by this office, I find that no evidence has been found nor have you provided any evidence to substantiate your allegation that you were placed in Administrative Segregation due to a lawsuit you filed against staff.

Therefore, I find no factual merit to this Grievance and no action appears warranted from my office in regards to this matter.

Appeal denied.

_K. Belk_____          _7-13-05_____
SIGNATURE                                           DATE

Please be advised that if you appeal this decision to the U.S. District Court, a copy of this Deputy/Assistant Director's Decision must be attached to any petition or complaint or the Court must dismiss your case without notice. You shall also be subject to paying filing fees pursuant to the Prison Litigation Act of 1996.